[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiffs, doing business as Pepe and Hazard, (hereinafter also "P H") constitute a law firm located in Hartford, Connecticut and have brought this action against the defendants Edgardo Ippoliti, individually, (hereinafter also "EI") and Eppoliti, Inc., (hereinafter also "defendant corporation"), both of Ridgefield, Connecticut to collect attorneys fees for services rendered, interest and attorneys' fees in connection with this action.[1] The attorneys' fees claimed for services rendered prior to this action were primarily in connection with defendant corporation's dispute with Turner Construction Company, a general contractor, concerning the construction of the Yale Center for Molecular Medicine building in New Haven.
What appeared initially to be a simple collection action is actually a vigorously contested matter which consumed approximately thirty days of trial including separate days for CT Page 5165 arguments on motions.
Plaintiffs have brought this action in eight counts (the third count was withdrawn) claiming in their amended complaint dated January 27, 1995 breach of contract, failure to pay a promissory note, quantum meruit, promissory estoppel, breach of a duty of good faith and fair dealing, fraudulent conveyance, fraud and violation of the Connecticut Unfair Trade Practices Act (hereinafter "CUTPA"). Defendants have denied these claims and have counter-claimed for breach of contract and breach of a duty of good faith and fair dealing, conversion and violation of CUTPA.
The court's decision in this case is based primarily on the issue of credibility. Based upon the totality of the evidence, including, but not limited to, the exhibits, the demeanor of the witnesses in testifying, their recall of certain events or their lack thereof, the interests of the witnesses or lack thereof, the conflicts in testimony among the witnesses and their responses on both direct and cross examination, the court finds the testimony on behalf of the plaintiffs to be more credible than that of the defendants or their witnesses, in particular, the individual defendant, Edgardo Ippoliti.[2] This conclusion is based primarily upon the following:
1. The defendant, Edgardo Ippoliti, testified on more than one occasion, initially as a witness called by the plaintiffs, and, later, as a witness for the defense in response to plaintiffs' complaint and as part of the defendants' counterclaim, that Turner Construction Company (hereinafter "Turner"), the general contractor with whom the defendant corporation had a dispute and for which dispute the plaintiffs were retained, had, during the late spring and early summer of 1990, offered to settle the dispute for $560,000, composed of $260,000 retainage and $300,000 damages for delay. He stated that representatives of Turner had offered that amount, in particular, Joseph Vumbacco, attorney for Turner. He testified that when P 
H was retained in May or June of 1990, he informed Louis Pepe, senior partner of P H, of that offer. This testimony was contradicted by the following:
(a) Testimony of Stuart Robinson, Senior vice-president of Turner on November 23, 1994. Mr. Robinson testified that he made no such offer, that he would have known if anyone else at Turner had made such an offer, and he was never told that such an offer CT Page 5166 had been made. He testified further that between May and August of 1990, Turner made no offers to defendants of four hundred thousand dollars ($400,000.00) or even three hundred thousand dollars ($300,000.00) He understood that these figures were a total of retainage and damages for delay. (T.T. pgs. 3 and 4). He stated that at that time the offer was only the contract balance (retainage), which, at that time, Turner believed was $200,000 — plus $50,000 on the damages claim, or a total of $250,000 — (T.T. pgs. 13 and 14). This was the biggest offer made to the defendant corporation prior to the filing of the demand for arbitration (T.T. pg. 13) which was filed by P H on or about August 20, 1990 (See plaintiffs' Exh. G.). Further, the claim by Edgardo Ippoliti that defendants were offered $560,000 — in the late spring/summer of 1990 is contradicted by plaintiffs' Exhibit H-7, a letter from Turner to the defendant corporation asserting a $170,000 counter-claim and rejecting in full the claims for delay made by the defendant corporation. The court is well aware that Turner had been in a dispute with defendants until the settlement of that dispute in March, 1993. However, that was approximately twenty-one months prior to Mr. Robinson's testimony, and despite valiant efforts of defendants' counsel to impeach his credibility, the court found no bias or lack of credibility in Mr. Robinson. The court found him to be a credible witness.
As for Attorney Vumbacco who Edgardo Ippoliti claimed made the offer of $560,000.00 on behalf of Turner, Mr. Robinson's testimony makes it clear that he was never aware of such an offer and believed he would have been informed of it if it had been made. Further, Mr. Robinson testified that Attorney Vombacco [Vumbacco] was, on November 23, 1994, still with Turner, as executive vice-president with his office in New York city and his home in New Rochelle, New York. Attorney Vumbacco was not called by the defendants as a witness, and the court is not aware of any efforts to contact him or take his deposition. Accordingly, there is no supporting evidence for Edgardo Ippoliti's contention in this regard.
(b) Testimony of Attorney Alan Kleban, a former partner of Pepe and Hazard, who had worked on the Turner case on behalf of the defendant corporation while at P H. He was not only involved in the Superior Court injunction action brought by Turner and the Appellate Court action in which Turner took an appeal of the Superior Court decision, but he was also deeply involved in settlement discussions with Turner on behalf of the defendant corporation. He testified that he was never informed of CT Page 5167 a $560,000 settlement offer by Turner. By July of 1991 Turner had reached a total settlement offer of approximately $350,000. By October of 1991 Turner's offer was between $350,000 and $400,000 and Turner's attorney (Abramson) said he could increase the offer to a little over $400,000. Attorney Kleban urged defendants in October, 1991 to accept $420,000, and they refused. No mention was ever made to Attorney Kleban by defendants or anyone on their behalf, i.e. employees, that Turner had previously offered $560,000. Attorney Kleban, who left P H in July, 1992, testified that he has not received any business from P H, and although the court is aware that he is a former partner of P H, the court saw no evidence of bias and from his demeanor and responses on the witness stand found him to be honest, reliable and credible.
(c) The testimony of Jeffrey Pagano on February 8, 1995. Mr. Pagano had worked for the defendant corporation from March, 1978 until June 8, 1993. Sometime in 1980 he was made vice-president of defendant corporation. He had a close relationship with the defendant, Edgardo Ippoliti. He was deeply involved on behalf of the defendant corporation under the supervision of Edgardo Ippoliti in estimating the quantity and cost of projects, negotiating contracts, managing projects and negotiating claims. He estimated and negotiated the agreement with Turner for the Yale Molecular Medicine project and managed that project for the defendant corporation under the supervision of Edgardo Ippoliti. He was deeply involved in settlement discussions concerning the dispute with Turner, with Edgardo and Marcia Ippoliti, representatives of Turner and with P H. He was present at meetings with Turner and Edgardo Ippoliti between January and July of 1990. He was aware of plaintiffs' Exhibit H-7 and that Turner at that time would "not honor the claims" by the defendant corporation. He testified that during the summer of 1990 defendant corporation was demanding the retainage of $240,000 plus a claim for delay damages of $314,000, for a total of $554,000. The most Turner offered at that time was the retainage ($240,000) plus $60,000 for delay damages for a total of $300,000. At the beginning of the settlement meeting in Shelton on October 24, 1991, Turner was still at a $300,000 total offer. Mr. Pagano also testified that the defendant, Edgardo Ippoliti, never told him Turner had offered $550,000 or $560,000. In sum, Mr. Pagano contradicted Edgardo Ippoliti's claim that Turner had offered the defendant corporation a settlement of $560,000. The court is aware from Mr. Pagano's testimony that his parting with the defendants was unpleasant and that he has a lawsuit pending CT Page 5168 against the defendant corporation for wrongful termination and against the defendant Edgardo Ippoliti for allegedly breaking his promise to Mr. Pagano to give him a percentage of another project. However, notwithstanding that, the court found no bias on the part of Mr. Pagano that affected his testimony, and based upon his demeanor and responses on the witness stand and his intimate knowledge of much of the relevant circumstances concerning the dispute with Turner and the dispute with plaintiffs, the court found him to be an honest, reliable and credible witness.
(d) The testimony of Louis R. Pepe, partner of P H. Although he is a plaintiff in this action, which in itself raises the issue of bias, the court found him to be candid, forthright and consistent in his testimony. He was, based upon his demeanor, attitude and responses on the witness stand, an honest, reliable and credible witness. He testified and the court so finds that he was never informed, by Edgardo Ippoliti or anyone else, of a $560,000 offer or anywhere near it from Turner until early 1993 when Edgardo Ippoliti asked for his opinion on the eventual settlement amount of $510,000.00.
(e) The testimony of Edgardo Ippoliti himself. Mr. Ippoliti admits that in October, 1991, Mr. Kleban pressured or "hammered" him to take $420,000, and he refused. In his final moments of testimony on March 22, 1995, Edgardo Ippoliti, in response to the court's questions, said he didn't recall asking Turner why the offer was only $420,000 when Turner had originally offered $560,000. "Perhaps I should have," he said, "but I didn't."
(f) It simply does not make sense that Turner would have offered the defendant corporation $560,000 in the late spring or summer of 1990, then later offer $300,000 and then as late as October 1991 offer no more than $420,000. If the $560,000 had been offered as claimed, it makes no sense for Edgardo Ippoliti not to have said that he was originally offered $560,000 when he rejected the $300,000 and $420,000 offers. On the last day of trial, the court asked Edgardo Ippoliti why, when an offer was made from Turner of $300,000, when Atty. Kleban "hammered" him in October, 1991 to take $420,000 in settlement, he didn't say, "but I was offered $560,000 in 1990," his response was "perhaps I should have, but I didn't." Edgardo Ippoliti claims that Mr. Robinson and Mr. Pagano were incorrect and/or lied on this issue. The facts speak otherwise. The court does not believe Edgardo Ippoliti's claim that an offer of $560,000 was made in 1990 as he CT Page 5169 claimed. There was never an offer for that amount, and Turner didn't go over $500,000 until early 1993 when the parties finally settled for $510,000.
(f) There was no testimony from Marcia Ippoliti confirming her husband's claim of a $560,000 offer.
(g) Based upon defendant's Exhibit 23 and the testimony of Mr. Pagano, the demand in the spring and summer of 1990 was a total of $540,000. Then, why would Turner have offered $560,000?
2. There are other facts, evidence and testimony which seriously impeach Edgardo Ippoliti's credibility.
 (a) Edgardo Ippoliti testified that after defendant corporations' offer to settle for $650,000 was rejected in July, 1991, there was no effort by P H to settle. However, he later admitted that there were settlement conferences at which a P H representative was involved subsequently including, but not limited to, the conference in Shelton in October, 1991 where P H "hammered" the defendants to settle for $420,000.
 (b) In the negotiations to settle the Forand matter, Attorney Kleban had offered on behalf of Eppoliti, Inc. to place a lien in favor of Forand on a piece of equipment (bulldozer) owned by Eppoliti, Inc. When Forand's attorney told Attorney Kleban that the piece of equipment was worth far less than what had been represented, Atty. Kleban testified that when he confronted Edgardo Ippoliti with that information, Mr. Ippoliti replied: "I tried to slip one through." Mr. Ippoliti denied he said that and testified that Mr. Kleban "dreamed that."
 (c) Attorney Ron Ochsner who had worked for P H or the Turner matter and the Lafayette Square Project for the defendant corporation testified that when he left P H in July of 1992, Edgardo Ippoliti offered him a job as house counsel for Ippoliti's businesses, but that he turned him down because of the travel involved. Edgardo Ippoliti stated emphatically in his testimony that he never made such an offer. The court found attorney Ochsner to CT Page 5170 be a reliable and credible witness. His demeanor on the witness stand, his responses to questions on direct and cross examination and his attitude in testifying all contributed to the court concluding that he was honest, reliable and candid. The court believes him. The court is well aware that Attorney Ochsner's relationship with P H was terminated by P H. It was not voluntary. He was told that he would not be made a partner and that he should look elsewhere for work. This termination would hardly make him favorably disposed toward P H when he testified. If anything, it might make him somewhat hostile toward P H. In short, he had no reason to lie on behalf of P H or against the defendants.
 (d) Edgardo Ippoliti accused Louis Pepe, Alan Kleban, Ronald Ochsner, Stuart Robinson and Jeffrey Pagano all of lying on the witness stand. For the reasons stated above, the court concluded otherwise and found them to be honest, credible and reliable witnesses and correspondingly found Edgardo Ippoliti's testimony lacking in credibility. Perhaps, some of Edgardo Ippoliti's lack of credibility is due to a lack of memory, but, nevertheless his lack of memory adversely affects his credibility.
 (e) The court finds all of the aforesaid testimony of Mr. Robinson, Mr. Pepe, Mr. Kleban, Mr. Pagano and Mr. Ochsner to be true and to be findings of fact.
Accordingly, the court, based upon the totality of the evidence, testimony and exhibits, finds, by a preponderance of the evidence, the following:
 I
The plaintiffs named in paragraph one of the First Count are the attorneys who constituted the law firm of Pepe and Hazard at the time of institution of this suit and are the proper plaintiffs in this action. At all relevant times, Edgardo Ippoliti was a substantial stockholder of and a duly authorized representative of the defendant corporation. CT Page 5171
The defendant corporation and the defendant Edgardo Ippoliti did for value, jointly and severally, execute a promissory note in favor of P H dated March 1, 1991 for $33,737.24, which had a maturity date of December 31, 1991 and is shown as plaintiff's Exhibit E. The plaintiffs are the holders of said note and its terms are incorporated herein by reference to plaintiff's Exhibit E. The court finds that no payments have been made on said note. The court believes Louis Pepe that this note was agreed between P H and the defendants to be separate from other billings, that this was an arrangement handled separately and was unusual as to the procedure for other billings. The court further believes that subsequent payments from the defendants to P H were, as agreed, to be applied to billings other than the billings that were the basis of said note. Checks of the defendants did not refer to the note but merely "on account" or there was no reference at all on them. Some of them referred to specific jobs or cases. It is strange that the checks would be specific as to jobs or cases being handled but were not specific as to reference to payment on the note. See defendants' Exhibit 6. At the time of payment, the debtor has the burden of directing to which one of two or more debts or items of an account a payment shall be applied. AmericanWoolen Co. v. Maaget, 86 Conn. 234, 244 (1912). Such direction was not made as to the note, and in the absence thereof, the plaintiffs had the right to make the allocation of the money received to their advantage. American Woolen, supra. U.S. v.Pollack, 370 F.2d 79, 80 (2nd Cir. 1966) held that a creditor has the right to apply monies received in a manner that gives the creditor the utmost advantage of such security as the creditor may possess. P H clearly, under the circumstances, had a right to apply payments to current billing and not to the note.
Further, when Louis Pepe sent a new note for $90,950.21 to be signed, and when he stated that the March 1, 1991 note would be rolled into or combined with the new note, why didn't the defendants respond with or comment that the March 1, 1991 note was already paid? There is no evidence of such a response. Marcia Ippoliti's explanation that it didn't make any difference because the total of what we owed was all that mattered is not believable, particularly in light of the belief at that time that Edgardo Ippoliti was liable personally only on the note. Also, see plaintiff's Exhibit I, a letter from the defendants dated March 5, 1993 in which they demanded return of the note upon payment of $85,000 to satisfy all outstanding sums due and owing. This letter was an admission that the note had not been paid. CT Page 5172
The court finds that said note of March 1, 1991 remains unpaid in full. Damages are awarded to the plaintiffs on Count One of their amended complaint in the amount of the principal of the note, $33,737.24, plus interest on principal from March 1, 1991 through December 31, 1991 @ 10% per annum as called for in said note in the amount of $2,810 plus interest on the principal of said note commencing January 1, 1992 through June 15, 1995 at 12% per annum as called for in said note upon default or $13,950.32, for a total of $50,497.56. Said note calls for reasonable attorneys fees in the event of default. The court awards attorneys fees, amount to be determined later, on said note for a total due on said note as of June 15, 1995 of $50,497.56 plus attorneys fees. The allegations of the First Count have been proved and, judgment should enter against both defendants, Edgardo Ippoliti and Eppoliti, Inc., in the amount of $50,497.56 plus attorneys fees.
 II
P H had represented the defendant corporation and the defendant, Edgardo Ippoliti, for several years (at least since 1985) prior to the retaining of P H for the Turner matter in May, 1990 and for several years prior to the incurring of bills for other matters that are part of plaintiffs' claim; and all charges for said representation were on a time devoted basis and bills were paid on that basis. Plaintiffs agreed to represent defendants and defendants agreed to pay for said representation as aforesaid.
The retaining of P H on matters other than the Turner case constituted a contract or contracts between plaintiffs and the defendant corporation, and the time spent thereon and the charges therefor that are part of plaintiffs' claims are due under said contract(s) and have not been paid. There has been at least partial performance of said contract(s) by the parties thereto. Accordingly, the defendant corporation has breached said contract(s). As for the Turner matter, P H was hired to represent the defendant corporation in the second half of May, 1990. The court finds that this was a verbal contract the terms of which were that the plaintiffs would represent the defendant corporation in its claim against Turner, evaluate the claim and proceed to file an arbitration claim and represent the defendant corporation in the arbitration itself. There has been at least partial performance of said contract by both parties to the contract. CT Page 5173
Defendant corporation claims that Mr. Pepe said, as part of the contract, that the fees would be a cap of, or about, $75,000, that he, Mr. Pepe, would work on the case personally and that P 
H would go all the way on this matter.
Mr. Pepe testified that at the time P H was retained on the Turner matter he told Edgardo Ippoliti that he, Pepe, would be the responsible party on this case at P H but that he would not do everything himself; he would assign people to do other aspects of the case, and that Edgardo Ippoliti agreed to that; that he, Pepe, would try the arbitration case before the arbitration panel. He denies ever saying that a $75,000 fee would cover everything. He doesn't recall estimating $50,000 to $100,000 as a fee, but to have done so would not have been inconsistent. The defendants never mentioned a fee cap until this case was commenced. Mr. Pepe testified that such a figure would have been for the arbitration proceeding only and that he told Edgardo Ippoliti when fees were discussed that there could be additional fees if additional problems arose. He testified that at the time of hiring there was no mention by either defendant or anyone connected with them of their having a cash flow problem or being unable to pay bills as they became due. Mr. Pepe's testimony was supported by the testimony of Jeffrey Pagano, who had been vice-president of the defendant corporation from 1980 to June 8, 1993. Mr. Pagano stated that at the time P H was hired for the Turner matter, Louis Pepe estimated a fee of between $50,000 and $100,000 for the arbitration matter if there were no complications or problems, if it was arbitration "without monkey wrenches"; "unless there were problems such as appeals, separate law suits, problems with waivers, injunction actions, counterclaims, waivers on claims, or change order problems."
For the reasons stated earlier, the court finds the testimony of Mr. Pepe and Mr. Pagano to be credible and reliable, their testimony to be true and findings of fact, and the testimony of Edgardo Ippoliti to be lacking in credibility. The court, therefore, finds that there was no cap on the fees to be charged, that the fees went beyond the estimate and/or would have gone beyond any estimate at the time of hiring if the matter had actually gone to arbitration; that the fees charged were customary and reasonable and never really disputed by defendants, that Mr. Pepe would have handled the arbitration hearing personally but the case was finally settled before an arbitration hearing took place; that Mr. Pepe remained involved in overseeing CT Page 5174 the matter throughout, engaged in several negotiations himself with Turner and its attorneys and did oversee the court actions. He did not actually handle the injunction action in court brought by Turner or the appeal to the Appellate Court. They were handled primarily by Attorney Kleban of P H., and Attorney Kleban was successful in the Superior Court and Appellate Court matters. Mr. Pepe did fulfill his obligation by his involvement in the Turner matter as he promised to. It is the defendant corporation that breached the contract by failing to pay the bills for the time expended by P H on the Turner matter. This failure to pay the bills absolved P H from any further responsibility to pursue the Turner matter to the end, although P H did continue to work on the matter until the defendant corporation refused to even pay the approximately $20,000 in costs for the arbitration proceeding. P H was justified in terminating its relationship with the defendant corporation in light of the prior breach of contract by the defendant corporation in not paying P H bills at all for essentially a one year period and for not paying adequate amounts on the bills prior to that time. Plaintiffs have performed the legal services promised. Accordingly, the court finds that the defendant corporation breached its contract(s) with the plaintiffs and awards damages of $98,702.68 in accordance with the bills for the work done which has never really been contested as to amount but which have not been paid. Interest on said amount at the 10% per annum statutory rate is also awarded from the date of last payment, March 13, 1992, to June 15, 1995 in the amount of $32,179.60. The allegations of the Second Count have been proven except that plaintiffs have proven in paragraph five a balance due of $98,702.68. Judgment should be entered for plaintiffs on Count Two against the defendant corporation for $98,702.68 plus interest of $32,179.60 as aforementioned for a total amount of $130,882.28.
 III
Plaintiffs have proven the allegations of the Fourth Count except that plaintiffs have proven the value of services to defendants to be $98,702.68. In particular the court finds that the fair and reasonable value of the services rendered by the plaintiffs that remains unpaid is $98,702.68. That their value is fair and reasonable is based upon:
1. The testimony of Louis Pepe
2. The bills for same CT Page 5175
 3. The fact that the defendants never seriously challenged or questioned the hours spent by the plaintiffs, the hourly charges therefor, or the charges for disbursements prior to the institution of this law suit, and in fact, made payments based upon the hourly rates charged on other bills of plaintiffs concerning the Turner matter and other similar matters.
 4. The fact that the court believes and finds that Turner would not have raised their offer of zero, (see plaintiff's Exhibit H-7 in which defendant corporation's demand for the retainage as well as damages was rejected in light of Turner's counterclaim) or their offer of $200,000 (testimony of Stuart Robinson — TT pgs. 13 and 14) into the eventual settlement amount of $510,000.00 without the services of P H described in the charges of $98,702.68, including, but not limited to, the victories of P H in the Superior Court injunction matter involving Turner and Turner's appeal to the Appellate Court.
Further, the defendants are liable to the plaintiffs under the principle of unjust enrichment. The defendants clearly benefited from the services of the plaintiffs as described above, the benefits have unjustly not been paid for by the defendants, and their failure to pay was to the plaintiffs' detriment.Hartford Whalers Hockey Club v. The Uniroyal Goodrich Tire Co.,231 Conn. 276, 283 (1994). The defendants have not paid the balance due of $98,702.68, and the plaintiffs have suffered a loss in that amount.
The plaintiffs conferred the benefit of their legal services upon the defendants, the defendants knew of the benefit and acceptance by the defendants of such benefit without payment therefor is unequitable.
The court finds that the defendant Edgardo Ippoliti and his wife, Marcia Ippoliti, made the promises described in the Fourth Count individually as well as on behalf of the defendant corporation. Edgardo Ippoliti and Marcia Ippoliti were the sole stockholders in the defendant corporation (45% Edgardo and 55% Marcia) as well as the only officers. Together, they had total control of all of the decisions and actions of the corporation. It is clear from the testimony regarding their participation with CT Page 5176 Turner and P H and their close relationship in all aspects of this trial that no significant action or decision was made by one without the knowledge and/or approval of the other. In UnitedElectrical Contractors, Inc. v. Progress Builders, Inc.,26 Conn. App. 749, 755, 756 (1992), the court stated that "the corporate veil will be pierced when `the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor.'" The court stated that the corporate veil may be pierced under the "instrumentality rule" upon proof of three elements:
 (1) "Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;
 (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and
 (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." Citations omitted.
The court finds that, under the totality of the evidence, all three elements have been proven by clear, unequivocal, precise and convincing evidence:
 (1) Edgardo and Marcia Ippoliti conspired to and did exercise complete domination of the defendant corporation with respect to finances, policy and business practice with respect to the defendant corporation's relationship and transactions with P H so that the defendant corporation as to such transactions had at the time no separate mind, will or existence of its own.
 (2) Edgardo and Marcia Ippoliti conspired to and did use such control to commit a wrong (i.e. not pay the bills despite promises to pay fair and reasonable charges), to CT Page 5177 perpetrate a violation of a positive legal duty (i.e. not to fulfill the duty to pay the bills as aforementioned) which was in contravention of plaintiffs' legal rights to be paid; and
 (3) The control and breach of the aforesaid duty proximately caused, actually solely caused, the unjust loss or injury complained of; i.e. non payment of the fair and reasonable value of the plaintiffs' services based upon promises to do so by the defendant corporation and of Edgardo and Marcia Ippoliti to do so.
Additionally, Edgardo and Marcia Ippoliti were the alter egos of the defendant corporation and are therefore, personally liable. "When the corporation is the mere alter ego, or business conduit of a person, it may be disregarded." DeLeonardis v.Subway Sandwich Shops, Inc., 35 Conn. App. 353, 358 (1994); seeDeSantis v. Piccadilly Land Corporation, 3 Conn. App. 310, 314
(1985).
Accordingly, the court finds that the corporate veil is pierced, Edgardo Ippoliti was an alter ego of the defendant corporation and that Edgardo Ippoliti[3] is individually liable as well as the defendant corporation for the quantum meruit claim of the plaintiffs.
Accordingly, on the Fourth Count, damages are awarded against both defendants in the amount of $98,702.62 plus interest thereon at the statutory rate of 10% per annum from the date of last payment (March 13, 1992) to June 15, 1995 of $32,179.60. Total judgment, therefore, should be entered on the Fourth Count in the amount of $130,882.28.
 IV
As to the Fifth Count, the court finds, based upon the totality of the evidence, the allegations of the complaint have been proven. In particular, as to paragraph five, the court finds that the defendant, Edgardo Ippoliti, individually represented to plaintiffs that they would be paid as alleged. This is based both upon his separate individual promise and upon the basis that the corporate veil of the defendant corporation is pierced and he is the alter ego of the corporation for the reasons described in this decision on the Fourth Count. He, is, therefore, personally liable for the bills for legal services and is estopped from CT Page 5178 asserting that plaintiffs are not entitled to be paid for such legal services. Accordingly, damages are awarded on the Fifth Count against the defendant Edgardo Ippoliti in the amount of $98,702.62 plus interest thereon at the statutory rate of 10% per annum from the date of last payment (March 13, 1992) to June 15, 1995 in the amount of $32,179.60, for a total of $130,882.28.
 V
As for the Sixth Count, the court finds, from the totality of the evidence and by clear, convincing, unequivocal and precise evidence, that:
 (1) The allegations of paragraphs one through seven have been proven except that as to paragraph seven the plaintiffs have proved the balance due and owing to be $98,702.62.
 (2) The defendant, Edgardo Ippoliti, was the principal contact for Eppoliti, Inc. with the plaintiffs.
 (3) Paragraph ten has been proven. The court finds that the defendant Edgardo Ippoliti made such representations individually and on behalf of the defendant corporation and is personally liable for such representations because he made them personally and because of the piercing of the corporate veil and his being the alter ego of the defendant corporation as hereinbefore described.
 (4) Paragraph eleven has been proven except that the actions alleged took place for many months prior to January, 1993.
 (5) The allegations of paragraphs twelve, thirteen, fourteen and fifteen have been proved.
 (6) Specifically, the defendants' undertaking of settlement negotiations with Turner without the knowledge of the plaintiffs, the defendants' repeated promises to plaintiffs that they would be paid in full for their services, that they would be paid from the proceeds of the Turner settlement, their converting the proceeds of the Turner settlement to avoid attachment by and payment to creditors, including the plaintiffs, the removing of assets from the defendant corporation to deplete its assets to avoid attachment such as the transfer of its CT Page 5179 equipment to Michael Ippoliti, Inc., controlled by Edgardo and Marcia Ippoliti's son Michael, without consideration,[4] and without notifying the plaintiffs, Edgardo Ippoliti's promises to plaintiff that they would be paid from the proceeds of the "Titicus-Pavarini closing (Defendant's Exhibit 18) or shortly thereafter which promises were not fulfilled, as well as the fraud and the fraudulent conveyances described hereafter in decisions on subsequent counts were all breaches of the defendants' duty to the plaintiffs of good faith and fair dealing.
The defendant, Edgardo Ippoliti, is personally liable for breach of the duty of good faith and fair dealing owed by him and the defendant corporation because he personally did what was alleged and proven and because the corporate veil of the defendant corporation has been pierced and he was the alter ego of same for the reasons described in this decision on the Fourth Count.
Accordingly, damages are awarded against both defendants in the amount of $98,702.62. plus interest thereon at the statutory rate of 10% per annum from the date of last payment (March 13, 1992) to June 15, 1995 in the amount of $32,179.60, for a total of $130,882.28.
The court does not award punitive damages on this count because the case cited by plaintiffs, L.F. Pace Sons, Inc. v.Travelers Indemnity Co., 9 Conn. App. 30, 48 (1986) provides that to award same there must be allegations of wanton or malicious misconduct. The allegations do not contain such language. An allegation of a breach of the duty of good faith and fair dealing regardless of the evidence produced is not an allegation of wanton or malicious misconduct.
 VI
As to the Seventh Count which alleges against the defendant, Edgardo Ippoliti, fraudulent conveyance, the court finds, from the totality of the evidence, and by clear, convincing, unequivocal and precise evidence, that:
 (1) Paragraphs one through seven have been proved except that as to paragraph seven, the plaintiffs have proved the balance due and owing to be $98,702.62. CT Page 5180
 (2) The defendant, Edgardo Ippoliti, was the principal contact for Eppoliti, Inc. with the plaintiffs.
 (3) Paragraph ten has been proven. The court finds that the defendant, Edgardo Ippoliti, made such representations individually and on behalf of the defendant corporation and is personally liable for such representations because he made them personally and because of the piercing of the corporate veil as hereinbefore described.
 (4) Paragraph eleven has been proven except that the actions alleged took place for many months prior to January, 1993.
 (5) The allegations of paragraphs twelve, thirteen and fourteen have been proved.
(6) Paragraphs fifteen and sixteen have been proven.
 (7) The defendant, Edgardo Ippoliti, is personally liable under this Seventh Count for two reasons:
 (a) When the defendant corporation transferred the subject funds, the transfer was the action of Edgardo and Marcia Ippoliti who conspired to do so, because they are liable as individuals on the basis of the piercing of the corporate veil of the defendant corporation and the finding of them to be the alter egos of the defendant corporation as set forth herein in he [the] court's decision as to the Fourth Count.
 (b) Further, Edgardo Ippoliti participated individually as well as on behalf of his other corporations, Eppoliti Enterprises, Inc., Eppoliti Realty Co. and Eppoliti Construction Corp. because, as testified by Marcia Ippoliti the morning of March 17, 1995, Edgardo Ippoliti was the sole stockholder and president of these corporations. Under United Electrical Contractors, Inc. v. Progress Builders, Inc., supra, the court stated that the corporate veil may be pierced under the "instrumentality rule" upon proof of three elements: CT Page 5181
 (1) "Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;
 (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and
 (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." Citations omitted.
The court finds that based upon the totality of the evidence, all three elements have been proven by clear, precise, convincing and unequivocal evidence.
 (1) Edgardo Ippoliti exercised complete domination of these corporations with respect to finances, policy and business practice with respect to all entities with which said corporations had relationships and transactions including Eppoliti, Inc. and with respect to all actions that had an effect upon such entities including P H, so that such corporations as to said relationships, transactions and actions that had an effect as described had at the time thereof no separate mind, will or existence of its own.
 (2) Edgardo Ippoliti used such control to commit a wrong (i.e. participated in the transfer of the funds from the settlement with Turner from Eppoliti, Inc. to his said corporations, and from M M Mason Supply Company, the status of which is hereinafter described, to his said corporations) in order to keep said funds from creditors of Eppoliti, Inc. including P H, to perpetrate a violation of a positive legal duty; i.e. not to fulfill the duty of Eppoliti, Inc., Edgardo Ippoliti and his wife, Marcia Ippoliti, to pay the aforesaid bills of the plaintiffs which was in contravention of plaintiffs' legal right to be paid; and CT Page 5182
 (3) The control and breach of the aforesaid duty proximately caused the unjust loss or injury complained of ($98,702,68).
 (4) Additionally, by clear, precise and unequivocal evidence, the court finds that Edgardo Ippoliti was the alter ego of the said corporations, Eppoliti Enterprises, Inc., Eppoliti Realty Co., and Eppoliti Construction Corp., and is therefore, personally liable for the actions of said corporations. "When the corporation is the mere alter ego, or business conduit of a person, it may be disregarded." DeLeonardis v. Subway Sandwich Shops, Inc., 35 Conn. App. 353, 358 (1994); see DeSantis v. Piccadilly Land Corporation, 3 Conn. App. 310, 314
(1985).
Accordingly, the court finds by clear, precise and unequivocal evidence that the corporate veil of said corporations is pierced and Edgardo Ippoliti was and is the alter ego of same and Edgardo Ippoliti is personally liable for the allegations which have been proven in the Seventh Count by participating as a recipient of said funds. The court finds that said funds were in part, transferred to these corporations and, therefore, to Edgardo Ippoliti.
Additionally, the court finds that M M Mason Supply Company was owned at all times relevant hereto, by the defendant, Eppoliti, Inc. and/or the defendant Edgardo Ippoliti. The M M Mason Supply Co. bank account carried Edgardo Ippoliti's social security number as the taxpayer identification number. See plaintiffs' Exhibits O and EE as well as the testimony of Marcia Ippoliti. She testified and the court finds that it was a separate company not incorporated that had been set up by the defendant corporation to purchase supplies at a better price than that which would have to be paid by the defendant corporation. It was, she said, and the court finds, Eppoliti, Inc. doing business as M M Mason Supply Company. Since the corporate veil of Eppoliti, Inc. has been pierced as described herein in the decision of the Fourth Count, the individual defendant, Edgardo Ippoliti, and his wife, Marcia Ippoliti, are charged not only with the acts of Eppoliti, Inc. but also those of M M Mason Supply Co. The defendant, Edgardo Ippoliti is also so charged because of his ownership interest in M M Mason Supply based upon its use of his social security number as its taxpayer CT Page 5183 identification number. Marcia Ippoliti testified in the plaintiffs' case in chief and again as a witness for the defendants on March 16, 1995 and the court finds that $281,000 of the Turner settlement was a check payable to Eppoliti, Inc. which was endorsed over to and deposited in the account of M M Mason Supply Company; that at least $230,000 of these funds were turned into cashiers checks to M M Mason Supply Company and placed in a drawer at Eppoliti, Inc. She testified and the court finds that this was done to keep these funds from possible attachments by creditors. Some of this money then went to the aforementioned other corporations owned by the defendant, Edgardo Ippoliti and some remained with M M Mason Supply Company owned at least in part by Edgardo Ippoliti. The court concludes, therefore, having pierced the corporate veils as aforesaid, and based upon the findings aforesaid, that the defendant, Edgardo Ippoliti, individually, participated in these actions by Eppoliti, Inc., M M Mason Supply Co. and the aforesaid corporations owned by said defendant, Edgardo Ippoliti. These actions constitute fraudulent conveyances by said defendant, Edgardo Ippoliti.
This finding of fraudulent conveyances is also based upon:
 (1) The transfers stated above and the transfer of the equipment to Michael Ippoliti, Inc. as described in the decision herein on the Sixth Count, were made by the defendant Edgardo Ippoliti as described with the intent to prevent such funds and equipment from being taken by legal process and with the intent of thereby defrauding the plaintiffs and preventing them from securing payment of the indebtedness due to them. The aforesaid transfers were made without consideration, they were not disclosed but rather concealed and the said defendant Edgardo Ippoliti retained control of the money transferred and continues to control some of it.
Accordingly, the court orders the setting aside of the transfer of the Turner proceeds by Eppoliti, Inc. and subsequent transfers thereafter and awards damages against Edgardo Ippoliti in the amount of $98,702.62 plus interest at the statutory rate of 10% per annum from the date of last payment which is March 13, 1992 to June 15, 1995 in the amount of $32,179.60, for a total of $130,882.28.
VII CT Page 5184
As to the Eighth Count, a claim of fraud against the defendant, Edgardo Ippoliti, the court finds by clear, convincing, precise and unequivocal evidence[5] as follows:
 (1) The allegations of paragraphs one through seven have been proven except that as to paragraph seven the plaintiffs have proved the balance due and owing to be $98,702.62.
 (2) The defendant, Edgardo Ippoliti, was the principal contact for Eppoliti, Inc. with the plaintiffs.
 (3) Paragraph ten has been proven. The court finds that the defendant Edgardo Ippoliti made such representations individually and on behalf of the defendant corporation and is personally liable for such representation because he made them personally and because of the piercing of the corporate veil as hereinbefore described.
 (4) Paragraph eleven has been proven except that the actions alleged took place for many months prior to January, 1993.
 (5) The allegations in paragraphs 12, 13, 14, 15, 16, 17, 18 and 19 have been proven.
(6) In addition the court specifically finds that:
 (a) The defendant, Edgardo Ippoliti, individually, made the promises alleged in the Eight Count both before and after July 28, 1992.
 (b) The said promises made by him were as an individual also based upon the piercing of the corporate veil and the finding of him to be the alter ego of the defendant corporation as previously described in this decision in regard to the Fourth Count.
 (c) Based upon the testimony of Mr. Pepe, which the court finds credible and the lack of credibility of the testimony of defendant Edgardo Ippoliti, as already found by the court, Edgardo Ippoliti did at a meeting on December 17, 1991 promise to Mr. Pepe, a partner of P H, that he would sign a promissory note individually to P H covering the outstanding balances to date due P H which, with the note CT Page 5185 dated March 1, 1991 referenced in this decision on the First Count, would total $90,950.21. The fact that Mr. Pepe subsequently sent a note for him to sign which combined the balance due on the March 1, 1991 note with the remainder of the balance due, totaling $90,950.21 does not alter the fact that Edgardo Ippoliti promised on December 17, 1991 and by his subsequent statements to Mr. Pepe, to be personally liable on the promissory note(s) to the plaintiffs totalling $90,950.21. See plaintiffs' Exhibit DDD for a copy of the note Edgardo Ippoliti agreed to sign.
"The essential elements of an action in fraud . . . are:
 (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. Miller v. Appleby, 183 Conn. 51, 54-55, 438 A.2d 811 (1981). A claim of fraud must be proven by clear and satisfactory evidence. Id., 55" (Internal quotation marks omitted.) Regis v. Connecticut Real Estate Investors Balanced Fund, Inc., 28 Conn. App. 760, 768, 613 A.2d 321 (1992). Whether the evidence supports the defendant's claim of fraud is a question of fact. Id., citing J. Frederick Scholes Agency v. Mitchell, 191 Conn. 353, 358, 464 A.2d 795 (1983); Miller v. Appleby, supra, 55." First Charter National Bank v. Ross, 29 Conn. App. 667, 670-671 (1992).
The court finds, by clear, unequivocal, precise, convincing and satisfactory evidence the following facts:
 1. Edgardo Ippoliti did make false representations as alleged as statements of fact that he would personally pay the bills of the plaintiffs past and future and would personally sign a promissory note to plaintiffs in the amount of $90,950.21; that the promises he made as described in this decision on the Eighth Count were false representations made as statements of fact.
 2. That Edgardo Ippoliti's said statements were untrue, and he knew them to be untrue when he made them. CT Page 5186
 3. That these false representations were made to induce the plaintiffs to act and/or rely on them; including continuing to represent the defendants in the Turner case.
 4. That the plaintiffs did continue to act and rely on said false representations by continuing to represent the defendants in the Turner matter including, but not limited to, pursuing an appeal to the Appellate Court and conducting settlement negotiations with Turner; by refraining from taking any action against defendants for legal bills incurred by them to the plaintiffs at a time when plaintiffs had an opportunity to do so, all to the injury of the plaintiffs in that they did not receive payment for the legal services to which they were entitled.
7. The court is well aware that under the Statute of Frauds a promise to answer for the debt of another must be in writing to be enforceable. However, that statute does not apply here for the following reasons:
 (a) Defendants have not pleaded the statute of frauds as a special defense.
 (b) Regardless of their failure to do so, the defendant Edgardo Ippoliti, as to the note for $90,950.21, did not make a verbal promise to pay the debt of the corporation as such, but rather promised to sign the note, i.e. promised to make a written promise, and it was his false promise to make a written promise by promising to sign the note that was the fraud as distinguished from a verbal promise to answer for the debt of the defendant corporation.
 (c) Regardless of (a) and (b) above, having pierced the corporate veil as described, the said defendant, Edgardo Ippoliti's false promises were his promises, as well as that of the defendant corporation.
8. For all of the foregoing reasons, the court finds by clear, convincing, precise and unequivocal evidence and based upon the totality of the evidence before it that CT Page 5187 the defendant, Edgardo Ippoliti, committed fraud against the plaintiffs as to monies owed to them. The court also finds, based upon the same standard of clear, convincing, precise and unequivocal evidence and based upon the totality of the evidence before it, that the actions of the defendant, Edgardo Ippoliti, were actions of the defendant corporation as well as Edgardo Ippoliti individually, and that, therefore, the defendant corporation also committed fraud against the plaintiffs as to monies owed to the plaintiffs. Damages are awarded for the plaintiffs against the defendant Edgardo Ippoliti for fraud on the Eighth Count in the amount of $98,702.68 with interest from the date of last payment, March 13, 1992, to June 15, 1995 at the statutory rate of 10% per annum, in the amount of $32,179.60 for a total of $130,882.28.
All of the above findings are by clear, precise and unequivocal evidence.
Attorneys fees are awarded to the plaintiffs under this count for fraud which will be set forth hereafter.
 VIII
As to the Ninth Count against both defendants alleging violations of CUTPA, the court finds by clear, precise and unequivocal evidence as follows:
 1. The same findings as made by the court in its decision on the Eighth Count.
 2. That Eppoliti, Inc. and Edgardo Ippoliti were doing business as M M Mason Supply Company yet failed to file a certificate of adoption of trade name with the Ridgefield, Connecticut Town Clerk's Office as required by G.S. § 35-1. See plaintiffs' Exhibit EEE.
 3. That having pierced the corporate veil of the defendant corporation and having found the defendant, Edgardo Ippoliti, to be an alter ego of said corporation as described in the decision on the Fourth Count, and having found that the bank account of M M Mason Supply Company used Edgardo Ippoliti's social security number as the taxpayer identification number, Edgardo Ippoliti, as well CT Page 5188 as his wife, Marcia Ippoliti who is not a defendant, was responsible for filing the certificate of adoption of trade name as aforesaid.
 4. G.S. § 35-1 states specifically that failure to file such a certificate ". . . shall be deemed to be an unfair or deceptive trade practice under subsection (a) of G.S. § 42-110b."
 5. In the recent case of Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 591, 592 (April, 1995), the court set forth the elements for a violation of CUTPA.
 "Section 42-110b(a) provides: `No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.' In determining whether certain acts constitute a violation of this act, `we have adopted the criteria set out in the cigarette rule by the federal trade commission . . . (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]. Conaway v. Prestia, [191 Conn. 484, 492-93, 464 A.2d 847 (1983)], quoting FTC v. Sperry Hutchinson Co., 405 U.S. 233, 244-45 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, 473 A.2d 1185 (1984); see Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (1964). Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 239, 520 A.2d 1008 (1987); Daddona v. Liberty Mobile Home Sales Inc., 209 Conn. 243, CT Page 5189 254, 550 A.2d 1061 (1988)."
 6. The court finds that the defendants, including the individual defendant, Edgardo Ippoliti, as a result of piercing the corporate veil and the finding that he is an alter ego of the defendant corporation and the findings in Paragraph 3 hereof, as aforesaid, engaged in an unfair or deceptive trade practice by having violated G.S. § 35-1; and that said defendants as aforesaid violated G.S. § 35-1 when they were in the conduct of trade or commerce as a general contractor as hereinbefore described. On this basis alone the defendants have violated CUTPA.
 7. As to the elements of the cigarette rule, the court finds that:
 1. Having found in its decision on the Eighth Count that the defendants committed fraud and on the Seventh Count that the defendant, Edgardo Ippoliti, made fraudulent conveyances, the defendants' fraud and Edgardo Ippoliti's fraudulent conveyances offend public policy as it has been established by statute, G.S. § 52-552 et seq., by the common law and by the established concept that fraud and fraudulent conveyances amount to unfairness.
 2. The fraud and fraudulent conveyances are immoral, unethical and unscrupulous.
 3. The fraud and fraudulent conveyances caused substantial injury to the plaintiffs (i.e. the loss of $98,702.68) who are in the category of either consumers or other businessmen.
 8. The injury to the plaintiffs also satisfies the three tests set forth in Williams Ford, Inc. v. Hartford Courant Co., at pg. 592. It is substantial as stated above, it is clearly not outweighed by any countervailing benefits to consumers or competition that the practice produces and it is not an injury the plaintiffs could reasonably have avoided. Mr. Pepe testified and the court finds that the plaintiffs relied on the false promises of the defendants, that they trusted the defendants', and, therefore, could not reasonably have avoided such injury. CT Page 5190
 9. Accordingly, the court finds that the defendants violated CUTPA for the reasons stated above and have suffered an ascertainable loss as a result thereof of $98,702.68. Damages are awarded against both defendants for violation of CUTPA in the amount of $98,702.68 plus interest at the statutory rate of 10% per annum from the date of last payment, March 13, 1992 to June 15, 1995 in the amount of $32,179.60, for a total of $130,882.28.
The court finds from the totality of the evidence, by clear, precise and unequivocal evidence, that the defendants' actions aforementioned constitute a reckless indifference to the rights of others and/or an intentional, malicious and wanton violation of those rights.
Accordingly, under this count, the court awards against both defendants attorneys fees to be set later and an additional $25,000.00 as punitive damages.
Additionally, the defendant, Edgardo Ippoliti is personally liable for the amounts for which judgment will be entered on the Second, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Counts because, in addition to the piercing of the corporate veil and the finding of him as an alter ego of the defendant corporation, he made the repeated promises described in these counts to be personally liable for the plaintiffs' charges for legal services in order to induce the plaintiffs to understand that he would be personally liable for these charges, and the plaintiffs, at all times, acted in reliance on that understanding. The court finds these facts from the totality of the evidence which the court finds to be clear, precise and unequivocal. These promises made by the defendant, Edgardo Ippoliti, were made by him with the intent of convincing the plaintiffs that he would be personally liable for these charges so that they would rely on these promises to provide legal services to the defendants. See OttoContracting Co. v. Schinella Son, Inc., 179 Conn. 704, 708-709
(1980). The court recognizes that these promises were not necessarily in writing. However, the statute of frauds prohibiting action on a verbal promise to answer for the debt of another, G.S. § 52-550, does not apply here. The court finds that these promises were not a collateral undertaking, that is to answer for the debt of another, but were, rather, original undertakings to which the statute of frauds does not apply. The court finds these promises were in fact desired by Edgardo Ippoliti for his own economic advantage rather than to benefit a CT Page 5191 third person, in this case the defendant corporation.[6] He and his wife were the sole stockholders of the defendant corporation (he owned 45% thereof), and the economic advantage of the legal services resulting from his promises was to him as a substantial stockholder and to his wife, Marcia as the other stockholder whose economic benefit he shared. That the economic benefit of the defendant corporation went to him is supported by the prior findings in this case in the Seventh Count that the Turner settlement funds went to Edgardo Ippoliti. It is clear that the economic benefit of the plaintiffs' legal services, went to him for the reasons described. The actions in regard to the transfer of the Turner settlement funds further supports this finding. The court finds the facts described in this paragraph based upon the totality of the evidence and based upon clear, convincing, precise and unequivocal evidence.
DEFENDANTS' CLAIMS AND COUNTERCLAIM
 I
Defendants' claim that plaintiffs are barred from recovery because of their rejection of the defendants' tender of payment. The "tender of payment" was part of an alleged settlement agreement between the parties. However, in order to be a valid agreement, there must be a meeting of the minds as to the terms of the agreement.[7] The court finds that there was no meeting of the minds, the agreement was invalid and unenforceable as a result thereof, and therefore any rejection of the "tender" of $85,000 does not bar plaintiffs from recovery. The $85,000 reflected a discount of approximately 15% from the amount due of approximately $100,000. Mr. Pepe agreed to accept $85,000 on certain conditions as outlined in his letter to defendants of February 26, 1993, (defendants' Exhibit 4), including that P H will be the trustee of the Turner settlement funds, defendants will execute releases to plaintiffs and Attorney Tim Corey of P 
H will negotiate final settlement differences with Turner on a time devoted basis. These terms were not acceptable to defendants, and then, by letter of March 3, 1993, (defendants' Exhibit 5), Mr. Pepe sent a modifying letter agreeing not to be the trustee of the Turner funds, and putting a cap on Attorney Corey's fee of $3,000. By letter of March 5, 1993 from defendants, (plaintiffs' Exhibit I), to plaintiffs, defendants stated that ". . . we felt that further negotiations with you about your terms would be futile" which showed there was still not a meeting of the minds. Defendants did not agree to release CT Page 5192 the plaintiffs which was still one of the outstanding conditions by the plaintiffs. Plaintiffs did not mention their requirement of a release from defendants to plaintiffs in their letter to defendants of March 29, 1993, (plaintiffs' Exhibit Q). Defendants testified and the court so finds that they did not consider that letter as a withdrawal of plaintiffs' demand for a release, made no further offer to plaintiffs and by letter of April 8, 1993 from plaintiffs to defendants, (plaintiffs' Exhibit ZZ), plaintiffs withdrew their offer to settle for $85,000 unless payment was made by April 15, 1993. Payment was not made. An issue also arose over whether defendants would be given the internal memoranda in their files and negotiations broke down. There was never a meeting of the minds on the conditions of settlement before the offer of $85,000 was withdrawn, and, therefore, there was no tender in accordance with agreed upon terms. The court also believes that the failure to act after the March 29, 1993 and April 8, 1993 letters and subsequent demands for internal memoranda were merely excuses by defendants not to pay the bills outstanding or even the $85,000. The court rejects this claim by the defendants; it is not a bar to plaintiffs' recovery, and defendants' actions in refusing and/or failing to pay the plaintiffs as promised were the proximate cause of plaintiffs' injuries/damages.
 II
Defendants' claim that plaintiffs are liable to defendants in conversion for retaining defendants' files. The court finds that plaintiffs had a right to retain the files under the general rule that ". . . . an attorney is under no obligation to release the files of a client unless there has been payment (of the attorneys' fees), the furnishing of adequate security (for same), or, of course a mutually acceptable arrangement between the parties." Marsh, Day Calhoun v. Solomon, 204 Conn. 639 (1987). As stated above, the alleged tender of $85,000 was less than the amount due and was acceptable only on the basis of conditions which plaintiffs had a right to place as part of the agreement to take less, which conditions the defendants refused to fulfill. Therefore, there was no payment or offer to pay the full amount of the bill which was $98,000 or higher. There was no mutually acceptable arrangement, nor was there furnishing of adequate security. The exception, of course, is if the retaining of the files would be of prejudice to the rights of the client, the defendants herein. No prejudice has been established. The court finds, based upon the testimony of Attorney Corey of P H that CT Page 5193 the files retained, except for the suit involving Milford Concrete Co., were all closed and/or completed/terminated files. Defendants did not offer any credible evidence that the retaining of these files prejudiced them in any way. The file on Milford Concrete was turned over to Attorney Lawrence Rosenthal, formerly with P H, but at the time in separate practice as defendants' attorney. Attorney Rosenthal, in answer to a question from the court, testified that any delay in turning over the Milford Concrete file to him did not adversely affect or prejudice the pending case or the defendants' interest therein, and the court so finds. Marsh, Day Calhoun, supra, refers in footnote four on pp. 646, 647 to Ethics Opinion 84-3 of the Statewide Grievance Committee which held that return of the files is mandated even if the fee is unpaid but "only when the failure to return the documents would jeopardize the client's claim." Not only have the defendants in the case at bar failed to show that the withholding of their files jeopardized any pending claims, but the testimony of Attorney Corey and Attorney Rosenthal aforementioned make it clear that it did not jeopardize any pending claims.
Accordingly, the court finds there was no conversion of the defendants' files by the plaintiffs.
Assuming, arguendo, that there had been conversion, the defendants have failed to produce any credible evidence of harm or damages to the defendants as a result of the retaining of the files: The sole damages mentioned in defendants' post-trial brief was the amount of their attorneys' fees to defend this action. This action was brought because of the defendant's failure to pay their bills to plaintiffs, which was the proximate cause of plaintiffs' damages. The court having found that the alleged agreement by the plaintiffs to later accept the lesser sum of $85,000 not to be a valid agreement for the reasons aforesaid, the court cannot find the refusal to accept the $85,000 or turn over the files was a reason for the defendants to defend this action. Therefore, the claim for compensatory damages for defense of this action must fail.
 III
As for defendants' claim that plaintiffs breached their agreement with the defendants, the court has previously found in its decision on the Second Count of plaintiffs' amended complaint the terms of that agreement: i.e. inter-alia that there was no fee cap of $75,000, that it was an estimate only and would not CT Page 5194 apply if there were problems, such as court actions etc., all as described in that decision; that the representation that Mr. Pepe would handle the matter himself was that he would handle the arbitration hearing but he would have other attorneys in his firm do other work, and that the plaintiffs would press Turner vigorously. These were the principal terms of the agreement as well as the defendants' promises to pay for the legal services on a time devoted basis. Where these terms vary with defendants' claims of the terms, the court finds that the terms mentioned above as described by plaintiffs and those in the second count decision were the actual terms. The court finds that the fees additional to $75,000 including those to be charged for work to be done did not breach the terms of the contract because of the qualifications/conditions stated by Mr. Pepe. The court finds that Mr. Pepe actively maintained overall supervision of the Turner matter, that he was actively involved in settlement discussions with Turner up to and including October, 1992, (plaintiffs' Exhibit TT), and was involved with the arbitration matter up to the end of January, 1993, (plaintiffs' Exhibits UU and VV). As a matter of fact, in early 1993, he reviewed documents at defendants request and responded to defendants questions as to the appropriateness of a $510,000 settlement. See testimony of Edgardo Ippoliti and Louis Pepe. It is clear that Mr. Pepe would have actually tried the arbitration hearing itself. It is true that Attorney Ochsner worked on several preliminary matters regarding Turner, and Attorney Kleban handled the cases in Superior Court and the Appellate Court; but all of this was done with the acquiescence and agreement of the defendants. Their willingness to accept the involvement of Attorneys Kleban and Ochsner is further evidenced by the fact that the defendants tried to hire Attorney Kleban to handle the Turner case after he had left P H and tried to hire Attorney Ochsner as house counsel after he left P H. There is no evidence that either of these attorneys rendered anything but competent and professional legal services. The fact that the Lafayette Square arbitration did not result in money for the defendants is not a basis for saying that Attorney Ochsner's services were less than competent and professional. As for Attorney Kleban, he won the cases in the Superior and Appellate Courts, so this court cannot see any basis for claiming that he was less than competent and professional. Mr. Pepe was involved to the end of the case with Turner; Mr. Ochsner and Mr. Kleban were utilized with the consent of the defendants, and the plaintiffs pursued this case vigorously against Turner up to the settlement, and it is their legal services that caused the CT Page 5195 increase in Turner's offer to the $510,000 upon which settlement was made. For all of these reasons, the court finds that the plaintiffs did not breach their contracts with the defendants. It is the defendants who breached their contracts with the plaintiffs by failing to pay the bills/charges for legal services. Further, there is no evidence that defendants have been damaged in any way concerning the contracts. To the contrary, the success in raising the settlement figure to $510,000 was due to the plaintiffs' legal services.
Defendants claimed breach by the plaintiffs of the covenants of good faith and fair dealing is without merit. As stated above, there was no breach of contract or conversion. Under the circumstances existing at the time, any demand for payment and a retainer for future work was not a breach of good faith and fair dealing. The court also does not believe or find that such a demand for payment of $100,000 on the billings plus a $100,00 [$100,000] retainer was made. Further, the court believes and finds that plaintiffs at one point asked only for the $20,000 in costs for the arbitration proceeding; i.e. costs of arbitrators, transcripts etc. which hardly indicates a $200,000 demand; and the defendants even refused to pay the $20,000 in costs, which was a breach of the defendants' covenant of good faith and fair dealing. Also, the court finds that the plaintiffs did not abandon the defendants, but, as stated above, continued to actively represent them up to the time of the actual settlement with Turner.
 IV
The court has already denied defendants' claim that the note was paid based upon the factual findings and reasons set forth previously in the decision on the First Count.
As to the defendant Edgardo Ippoliti being an accommodation party, G.S. § 42a-3-415 refers to an endorser. Edgardo Ippoliti was clearly a maker on the note jointly and severally liable. Catania v. Catania, 26 Conn. App. 359, 364 (1992) does say that "an accommodation party can sign a note in any capacity-as a maker, acceptor, drawer or endorser." However, Catania
goes on to say that "the defendant . . . bears the burden of proving his accommodation status, which includes proof of the original holder's knowledge or acceptance of him as an accommodation maker. . . . It is a question of the intention of. . . . The person who would be the accommodated party, and the person who CT Page 5196 was the holder . . ." . . . "The intention of the parties as to accommodation status is a factual issue". The court finds from the totality of the evidence that P H had neither knowledge of or accepted Edgardo Ippoliti's intent to be an accommodation party if that is what he so intended, (and there is no evidence as to his intention) and certainly P H never had an intention that Edgardo Ippoliti would be an accommodation party. Further, Edgardo Ippoliti does not meet the requirements of G.S. § 42a-3-419(c).
Also, since the court has found in its decisions aforementioned on the plaintiffs' amended complaint that at all times Edgardo Ippoliti was acting personally because of the piercing of the corporate veil, the finding of him to be an alter ego of the defendant corporation and the finding that he made all of his promises to personally pay the amounts due by the defendant corporation in order to induce the plaintiffs to rely upon them to provide legal services, these promises being outside the statute of frauds, although the promise on the note is in writing, the court finds him liable personally on the signed note setting forth the obligation of the defendant corporation.
 V
As for defendants' claim that the plaintiffs have not sustained their burden of proving fraud by Edgardo Ippoliti, the court finds that the plaintiffs have sustained their said burden based upon the findings of facts and reasons previously set forth in the court's decision in regard to plaintiffs' Eighth Count.
 VI
As for defendants' claim that there was no fraudulent conveyance of the Turner settlement funds, the court disagrees with defendants' statement of facts, rejects defendants' claims and finds the fraudulent conveyance of the Turner funds took place based upon the findings of facts and reasons previously set forth in the court's decision in regard to plaintiffs' Seventh Count.
 VII
As for defendants' claim that plaintiffs, not the defendants, violated CUTPA, the court has already found no conversion, no breach of contract and no violation of a duty of good faith and CT Page 5197 fair dealing by the plaintiffs. The plaintiffs did not abandon the defendants as previously concluded in the court's decision in paragraph III hereof. The court disagrees with the allegations of the defendants on page 32 of their post-trial brief dated April 12, 1995; and therefore, finds that the plaintiffs' conduct was not immoral, unethical, oppressive or unscrupulous. Further, the defendants have neither alleged nor proven an ascertainable loss. The court, therefore, finds that the plaintiffs did not violate CUTPA.
As for defendants' violation of CUTPA the court finds for the plaintiffs based upon the factual findings and reasons set forth in its decision on plaintiffs' Ninth Count.
 VIII
As for defendants' claim that plaintiffs have failed to prove the value of their services, the court has carefully scrutinized plaintiffs' itemized statements of services both independently and in listening to Attorney Bollo's detailed examination of Mr. Pepe concerning them. The court finds that these statements or charges are reasonable, and they bear a proper relationship to the importance of the services required. The services produced the settlement of $510,000.00. The statements and the testimony and exhibits in this case convince the court that the statements/fees were reasonable and proper under the principles set forth (a-f) on pages two and three of defendants' reply brief taken from the decision in Scalo v. Ashton, 1 Conn. Ops. 410, a Bridgeport Superior Court decision dated March 17, 1995.
 IX
The court finds the defendants' conduct was the proximate cause of the plaintiffs' damages.
The plaintiffs' acted reasonably under the circumstances and did not breach their duty to mitigate damages. Reference the court's finding that despite strenuous efforts by plaintiffs to settle this matter between the parties, there was no meeting of the minds. Plaintiffs did not act unreasonably in trying to settle this dispute.
Plaintiffs' conduct did not prevent or obstruct performance by the defendants of their obligations. CT Page 5198
Other than the claims addressed hereafter, the court has already ruled on the remainder of defendants' claims in their reply brief in its decisions on the plaintiffs' amended complaint.
OTHER CLAIMS OF THE PARTIES
 I Statute of Limitations: Plaintiffs' claim that defendants' claims for breach of contract are barred by the three year statute of limitations, G.S. § 52-581 is not persuasive. The date the statute begins to run is not the date of the contract but, rather, the date of the breach. Defendants' counter-claim of January 13, 1995 contains allegations of breach of contract (the January 17, 1995 amendment was merely to add a CUTPA claim). The alleged breaches could have taken place subsequent to January 13, 1992. See First Count, Par. 7-10 of the counterclaim. The court finds for the reasons stated previously that the plaintiffs' committed no breach of contract or duty of good faith and fair dealing so the statute of limitations issue is moot; however, it is not a bar to claims of breach occurring after January 13, 1992.
Defendants have not briefed a defense of statute of limitations so any claim of such is deemed abandoned. Even if they had claimed it, it is clear that it has not run against the plaintiffs' claim. Suit was instituted by plaintiffs on May 14, 1993, and clearly the breaches by the defendants occurred after May 14, 1990.
Apparently, no one has claimed a statute of limitations defense on the CUTPA claims, but it wouldn't apply anyway. Defendants' CUTPA violations were continuous and/or well after January 27, 1992, and plaintiffs alleged CUTPA violations, which the court has found not to be proven, were allegedly in part after January 17, 1992.
 II Waiver and Estoppel: These defenses were claimed by all parties.
Defendants' counterclaims ware allegedly brought to conform to the proof of this case. If the defendants did not have full CT Page 5199 knowledge of their rights until this case was tried, and that appears to be true, at least in part, then the court is not convinced that waiver is a valid defense against the counterclaim.
Plaintiffs' claim of estoppel does have merit, however. Two essential elements must be proved by a party claiming equitable estoppel: (1) a statement or action by the party against whom estoppel is claimed, designed to induce reliance on that statement or action; and (2) a changed position by the second party in reliance on the act or statement of the first that results in loss or injury to the second party. Rosenfield v.Metals Selling Corp., 229 Conn. 771, 793-4, (1994); Lunn v.Tokeneke Assn., Inc., 227 Conn. 601, 607, (1993).
(1) Defendants did make repeated promises to pay plaintiffs, individually and on behalf of the defendant corporation by Edgardo Ippoliti for the reasons hereinbefore set forth, and they were designed to induce reliance by the plaintiffs on these promises.
(2) Plaintiffs, in reliance on these promises, continued to incur time and expense to provide legal services to the defendants without being paid and in effect financed these legal services for them and became a lender. This estoppel is a bar to the counterclaim for breach of contract and the duty of good faith and fair dealing.
Waiver is not a defense that can be used by the defendants. Plaintiffs may have had knowledge of their rights against defendants but never did anything to relinquish them.
Estoppel is also not available to the defendants. Defendants have not proven the two conditions mentioned above. Further, there was no conduct by the plaintiffs that precludes them from asserting their rights.
 III Laches: On the basis of defendants not knowing all they needed to know until the proof was made in this trial, the court is unpersuaded that defendants are subject to the defense of laches. For the same reasons, plaintiffs not knowing all they needed to know until this trial, laches is not a defense to the plaintiffs' CUTPA claims, and as to the other claims of CT Page 5200 plaintiffs, they were timely brought.
 IV Unclean Hands: Because this action is not primarily an equitable action a defense of unclean hands does not apply to any of the parties.
A hearing has been scheduled for June 15, 1995 on the issue of the amount of attorneys' fees to be awarded under the First, Eighth and Ninth Counts of plaintiffs' amended complaint. Accordingly, final judgment will not be entered until after such hearing.
At the time of final judgment, judgment will be entered on the plaintiffs' amended complaint dated January 27, 1995 as follows:
COUNT: AGAINST DEFENDANTS AMOUNT INCLUDING INTEREST
First Count Both Defendants $ 50,497.56 plus attorneys' fees
Second Count Eppoliti, Inc. $130,882.28
Fourth Count Both defendants $130,882.28
Fifth Count Edgardo Ippoliti $130,882.28
Sixth Count Both defendants $130,882.28
Seventh Count Edgardo Ippoliti $130,882.28
Eighth Count Edgardo Ippoliti $130,882.28
Ninth Count Both defendants $155,882.28
TOTAL JUDGMENT
CT Page 5201
 (1) Compensatory Damages $ 98,702.68 (2) Punitive Damages 25,000.00 (3) Interest on all counts 3/13/92-6/15/95: @ 10% per annum 32,179.60 (4) Additional interest on First Count on $33,737.24 principal: (a) 3/1/91-12/31/91 10% per annum = $2,810.00 (b) 1/1/92 — 3/13/92 @ 12% per annum= 798.48 (c) 3/14/92 — 6/15/95 @ 2% per annum = 2,197.18 --------- (excess of 10% already assessed) $5,805.66
 5,805.66 ----------- Total: $161,687.94
Plus attorneys' fees to be awarded on Counts One, Eight and Nine at time of final judgment.
Rittenband, J.