## J. FREDERICK SCHOLES AGENCY *v.*
## E. STUART MITCHELL ET AL.
## (10989)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued May 6—decision released September 6, 1983

*James D. Reardon,* for the appellant (plaintiff).

*Barbara S. Miller,* for the appellees (defendants).

GRILLO, J. The plaintiff, an insurance agency, brought this action to recover unpaid insurance premiums resulting from the sale of insurance to Chimney Point Marine, Inc. (hereinafter Chimney Point), a marina located on the shore in Old Saybrook. The plaintiff's principal claim is that because the defendant E. Stuart Mitchell, individually and as agent for the corporate defendant, the Mitchell Company, caused to be issued a worthless check purporting to satisfy the overdue premiums, upon which conduct the plaintiff reasonably relied to its detriment, it is entitled to recover for fraudulent misrepresentation.

The trial court could have reasonably found the following facts as supported by the record: In 1977 and the first several months of 1978, the stockholders of Chimney Point were the defendant Mitchell Company, which owned 85 percent of the stock, and the Cimco Company, which owned 15 percent.[1] The defendant E. Stuart Mitchell was a director and the president and treasurer of Chimney Point, as well as a director, stockholder and treasurer of the Mitchell Company.

During 1977, the plaintiff furnished Chimney Point with various insurance policies relevant to its marina operations. By January, 1978, total premiums due

---

[1] The defendants in the present action include the Mitchell Company and E. Stuart Mitchell. Cimco is not a party to this proceeding.

amounted to $11,068.[2] On approximately January 30, 1978, the plaintiff instituted suit against Chimney Point to recover the overdue premiums. Upon commencement of this suit, the plaintiff obtained prejudgment attachments on several boats then registered to Chimney Point. These boats were encumbered with prior recorded liens of an undetermined amount. The market value of the boats and the equity interest, if any, of Chimney Point in the attached property have never been established.

On February 27, 1978, E. Stuart Mitchell, acting in his capacity as treasurer of the Mitchell Company, issued and signed a check payable to the plaintiff in the amount of $11,068. The check was purportedly drawn on an account entitled "The Mitchell Company, Special Account, P.O. Box 188, Portland, Conn. 06480." The check was payable through the Oxford Trading Establishment on an account with the Merchants and Shipowners Bank in Kingston, St. Vincent, West Indies.

On March 2, 1978, the plaintiff presented the check to its bank for deposit. Shortly thereafter, the plaintiff learned that the check was refused acceptance, and it has not been honored subsequently. Prior to the dishonor, however, the plaintiff withdrew its lawsuit against Chimney Point and simultaneously released its attachment on the boats, assuming that the debt had been paid in full by the check. By the time the present suit was commenced, in August, 1978, no assets of Chimney Point were available for attachment.[3]

---

[2] When the policies were cancelled, insurance company credits reduced the amount owed by Chimney Point to $8688.

[3] Upon commencement of this action the plaintiff obtained an attachment on a boat owned by E. Stuart Mitchell. This lien was subsequently released, however, because of a flaw in the attachment.

The defendant E. Stuart Mitchell testified at length concerning the events leading up to the issuance of the check. Chimney Point had been seeking additional financing for four to five years prior to 1978 so as to expand its facilities. In Mitchell's opinion the marina was too small to be profitable, which led to insolvency and the eventual demise of the business.

In his search for financing, Mitchell used the services of a New York company called Oaks-Darby, which provided investment banking and mortgage brokerage services. In 1977, Oaks-Darby introduced Mitchell to a person named Kelly of the Oxford Trading Establishment, a company which Kelly claimed to be an agent for the Merchants and Shipowners Bank in Kingston, St. Vincent, West Indies. Kelly and Mitchell reached an agreement whereby the Oxford Trading Establishment would provide Chimney Point with one million dollars in financing toward marina expansion and condominium construction. In return, the Oxford Trading Establishment would receive joint title to sixty-seven acres owned by Chimney Point in Old Saybrook, and the business would thereafter operate as a joint venture. A promissory note for this financing was signed by Chimney Point and its owners, the Mitchell Company and Cimco.

Additionally, the Merchants and Shipowners Bank, through the Oxford Trading Establishment, purportedly agreed to provide Chimney Point with interim financing to meet ongoing expenses until the permanent financial arrangements were completed. Toward this end, Kelly gave Mitchell a series of checks supposedly drawn upon a special Mitchell Company account at the Merchants and Shipowners Bank. Mitchell subsequently sent one of these checks to the plaintiff to pay for the insurance previously issued to Chimney Point.

Although E. Stuart Mitchell testified that he had no reason to believe that the check would be dishonored and in fact believed that money had been deposited into the "special account," he made no independent investigations of either the Oxford Trading Establishment or the Merchants and Shipowners Bank to determine whether these organizations were existing, viable entities. Moreover, apart from the representations made by Kelly, Mitchell never communicated with either the bank or the company to determine whether company funds were on deposit at the time of the issuance of the check.

The trial court, although characterizing Mitchell's actions as "lacking in sound business judgment," nevertheless concluded that the plaintiff had failed to prove that Mitchell's conduct constituted fraud, clearly and unequivocally, either personally or as a corporate officer of the Mitchell Company. Accordingly, the court rendered judgment in favor of the defendants, from which judgment the plaintiff appeals.[4]

The plaintiff presents the following issues: (1) whether the trial court erred in concluding that Mitchell's conduct was not fraudulent; (2) whether the trial court erred in refusing to hold Mitchell personally liable; and (3) whether the trial court erred in stating, in its remarks in dicta, that damages would be limited to the amount secured by the prejudgment attachment and not the amount of the check.[5]

---

[4] The trial court further rejected the plaintiff's attempt to recover from the Mitchell Company on a theory of the assumption of Chimney Point's debt. The plaintiff does not pursue this claim in this appeal.

[5] Although the plaintiff briefed an additional claim seeking to impose liability on the defendant E. Stuart Mitchell as an endorser under the Uniform Commercial Code, the plaintiff did not raise this issue in the trial court. "Appellate review on this nonconstitutional issue is, therefore, precluded." *State* v. *Morgan*, 179 Conn. 617, 619–20, 427 A.2d 429 (1980). Moreover,

" 'Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways. They present, however, issues of fact.' " *Miller* v. *Appleby,* 183 Conn. 51, 55, 438 A.2d 811 (1981). "Connecticut case law firmly establishes that fraud must be proven by a standard more exacting than 'a fair preponderance of the evidence.' " *Alaimo* v. *Royer,* 188 Conn. 36, 39, 448 A.2d 207 (1982). This middle tier standard has been formulated as " 'clear and satisfactory evidence' " and as " 'clear, precise and unequivocal evidence.' " Id. Upon appellate review, "[t]he decision of the trial court will not be reversed or modified unless it is clearly erroneous in light of the evidence and the pleadings in the record as a whole." *Miller* v. *Appleby,* supra; see Practice Book § 3060D.

"The essential elements of an action in fraud, as we have repeatedly held, are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller* v. *Appleby,* supra, 54–55. With respect to the scienter element, "[w]e have had occasion to point out that where a defendant has special means of knowledge, and a plaintiff can under the circumstances attribute to the former accurate knowledge of what is represented, the plaintiff need not show the actual knowledge of the falsity of the representation. See *Richard* v. *A. Waldman & Sons, Inc.,* 155 Conn. 343, 346–47, 232 A.2d 307 (1967); *Warman* v. *Delaney,* 148 Conn. 469, 172 A.2d 188 (1961); see also 37 Am. Jur. 2d, Fraud and Deceit § 201." *Miller* v. *Appleby,* supra, 56; see *Johnson* v. *Healy,* 176 Conn. 97, 102, 405 A.2d 54 (1978).

at oral argument the plaintiff admitted that this is not an action under the Uniform Commercial Code; it is an action "on the instrument" only in the sense that the check itself constitutes the statement of fraud.

Applying these guidelines in light of the subordinate facts recited above, we doubt the appropriateness of the trial court's determination that it was exculpatory that Mitchell's "intent in issuing the check was to pay a debt owed the plaintiff and that he believed, however mistakenly, that financing was being provided by the Oxford Trading Establishment." Clearly, Mitchell was in a superior and special position, upon which the plaintiff could rely, from which to ascertain conclusively the existence of the financing ostensibly being provided. Under these circumstances, to the extent that the court's decision implies actual knowledge of the falsity as a prerequisite to recovery, we find the judgment erroneous.

We need not, however, pursue this issue further, for we are unable to conclude that the issuance of the check "was made to induce the other party to act on it . . . ." *Miller* v. *Appleby,* supra. The trial court held that "[t]here was no clear evidence that [Mitchell's] intent was to cause release of the attachment or that he could reasonably expect that the mere delivery of the check before it was honored and the debt paid would cause [the] plaintiff to release the attachment." We agree.

An actionable misrepresentation, whether made knowingly, recklessly, negligently or innocently, must be made for the purpose of inducing action upon it. *Richard* v. *A. Waldman & Sons, Inc.,* supra; *Warman* v. *Delaney,* supra, 473; *Clark* v. *Haggard,* 141 Conn. 668, 673, 109 A.2d 358 (1954). We have reviewed the record before us, and find it devoid of any evidence that the issuance of the check was made for the purpose of inducing the plaintiff to drop its lawsuit and to release the attachment. No evidence was presented that issuance was expressly or impliedly conditional upon releasing the attachment. While Mitchell testified that the

check was intended to satisfy the overdue premiums, and it is reasonable to infer that *after* clearance the plaintiff would no longer pursue its pending suit, we do not interpret the mere issuance of the check, which is the misrepresentation at issue, as made for the purpose of inducing any action on the part of the plaintiff. The judgment of the trial court cannot be construed as clearly erroneous.

Since we conclude that the trial court did not err in its conclusion that E. Stuart Mitchell did not defraud the plaintiff, we need not reach the remaining assignments of error.

There is no error.

In this opinion the other judges concurred.