[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this case the plaintiff, James A. Russo (Russo), seeks damages from the defendant, Albert Bonavita (Bonavita), based on allegations of mutual mistake and misrepresentations in connection with the sale of land and from Bonavita and Martin Media, the successor to Patrick Media Group of Hartford, Inc. (Patrick), for tortious interference with a business relationship and violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110a et seq. ("CUTPA").
After a trial of this action the court finds the following facts. At all times relevant to this action Russo operated an automobile towing and repair business as his primary occupation. His actions in this case were taken on behalf of a partnership which consists of himself, his wife, Susan Russo, and his cousin, Francis Russo. Prior to March of 1989, the Russos had purchased one property on East Service Road in Hartford, Connecticut for the purpose of renting that property as the site of a billboard sign. As a result of that experience they became interested in purchasing CT Page 12546 other property for the same purpose.
Prior to March of 1989, Bonavita, of Springfield, Massachusetts owned two contiguous parcels of land on Homestead Avenue in Hartford. The first parcel, known as 101-103 Homestead Avenue is a small rectangular parcel, approximately 45 feet wide and 150 feet deep, which fronts on the southerly side of Homestead Avenue (the "subject property"). The second, larger parcel is a corner lot, occupying the southeasterly corner of the intersection of Homestead Avenue with Sigourney Street.
At all times relevant to this action Bonavita was the owner of The Loan Store, Inc., which had four locations in Massachusetts. He purchase the Homestead Avenue Property as the location for a check cashing business. All of Bonavita's affairs relating to the Homestead Avenue properties were handled by his employee, David Rosen.
At some time prior to March, 1989 Vasco Gomes, a realtor with Real Estate Service Company (RESCO), showed the Homestead Avenue property to the Russos. The Russos clearly informed Mr. Gomes that they were interested in purchasing the subject property because it had a billboard located on it.
Prior to purchasing the subject property the Russos viewed the two properties, which appeared to be divided by a guardrail with the billboard located entirely to the east of that guardrail on the subject property. In addition, Rosen told the Russos that the billboard was located on the subject property and the Russos made it clear to Rosen that they were interested in purchasing the subject property specifically because of the location of the billboard thereon.
Russo purchased the subject property, 101-103 Homestead Avenue, on March 31, 1989 for $80,000. At the closing Russo received the existing lease between the owner of the billboard, Patrick Media Group of Hartford, Inc. and Alexander Paddyfote, Bonavita's predecessor in interest. That lease was for a five year term, ending on November 30, 1989 and contained automatic annual renewals thereafter, unless notice was given by either party at least 30 days prior to the termination of the original term of the lease. The rent under the lease was $1,300 per year, payable in advance. Unfortunately, the lease did not specifically identify the subject property as the site of the billboard. At the closing Russo also received an adjustment for the entire amount of the CT Page 12547 prepaid rent on the billboard lease attributable to the portion of the lease year in which Russo owned the property.
The Russos purchased the subject property with the intention of maintaining a billboard thereon. At the time of the purchase the Russos knew that by virtue of the zoning laws of the City of Hartford, which required a separation of 100 or 300 feet between billboards, they could effectively control the billboard market in the immediate area, because the existing billboard was on their property. As the owner of the property Russo was the only one who could insure that the existing sign would be removed and, consequently, the only one who could obtain a building permit for a new sign in conformity with the Hartford Zoning Ordinances. The subject property has a value of $5,000 if it cannot be used as the location of a billboard.
After purchasing the property, the Russos contacted Peter McClary of Metro Bulletins Corp. concerning the erection of a billboard on the subject property. Metro Bulletins Corp. was in the business of constructing and leasing billboards to advertisers. McClary told Russo that Metro Bulletins would pay Russo $9,000 per year with a minimum term of five years as rental of the subject property for the location of a billboard. Russo then authorized McClary to apply for a building permit from the City of Hartford for the construction of a new billboard. During November, 1989, the City of Hartford did issue a building permit to Metro Bulletins conditioned upon the removal of the existing billboard owned by Patrick Media. On November 28, 1989, Metro Bulletins Corp. executed a lease with a five year term in which it agreed to pay Russo $9,000 per year as rental for a billboard on the subject property.
Russo gave Patrick Media timely notice of his intention to terminate the existing billboard lease and instructed Patrick Media to remove the existing billboard. After Patrick Media received that notification on October 31, 1989 David Wolfe, the vice president and general manager of Patrick Media, offered to pay Russo $7,000 per year as rental of the subject property, but Russo was not interested because he had a better offer from Metro Bulletins.
At the time Russo gave notice to Patrick Media to remove the billboard from the subject property, he, Bonavita, Metro Bulletins and Patrick all believed that the existing billboard sign was located entirely on the subject property. However, David Wolfe, CT Page 12548 apparently unhappy at the prospect of a valuable billboard location being lost to a competitor, quickly commissioned a survey of the subject property. That survey showed that a portion of the existing billboard was located on the 111 Homestead Avenue property, which was still owned by Bonavita. Wolfe immediately contacted Rosen to inform him of the results of the survey and inquire as to whether Bonavita was interested in entering into a new billboard lease on the 111 Homestead Avenue property. At that time Wolfe was aware that if Bonavita agreed to this scheme, then Patrick could effectively block Russo from using the subject property as a location for any billboard. Wolfe knew that Russo's billboard application would be conditioned upon the removal of the existing sign and if Bonavita went along with Patrick's assertion that the existing sign was partially located on Bonavita's property, then Patrick could truthfully represent to the City of Hartford that Patrick, and not Metro Bulletins, had rights to the existing billboard, and that that billboard would not be removed.
Soon thereafter, Wolfe contacted Bonavita. At that time Bonavita knew that Russo had paid him $80,000 for the subject property solely for its use as a billboard location, knew or should have known that Rosen, as Bonavita's agent, represented to the Russos that the existing billboard was located entirely on the subject property, and knew or should have known that Russo received all of the prepaid rental for the billboard sign at the closing. Nevertheless, Bonavita did not hesitate to take advantage of his agent's misrepresentations as to the location of the billboard. He agreed to let Patrick "relocate" the existing billboard, so that its would be entirely located on 111 Homestead Avenue.
After obtaining that agreement from Bonavita, Patrick informed the City of Hartford that Patrick was the owner of the existing, sign, and did not intend to remove same. This caused Hartford to cancel Metro Bulletins' sign permit, which was contingent upon the removal of the existing sign. Without a sign permit, Metro Bulletins could not construct a billboard on the subject property, and could not enter into a lease with the Russos. The Russos were left with a property for which they had paid $80,000 which was then worth $5,000.
A "mutual mistake exists where both parties are mistaken as to the same material fact." Dainty Rubbish Service, Inc. v. BeaconHill Assn., Inc., 32 Conn. App. 530, 537, 630 A.2d 115 (1993); BuolMachine Co. v. Buckens, 146 Conn. 639, 641, 153 A.2d 826 (1959). Mutual mistake as to an existing or past fact is a justifiable CT Page 12549 ground for rescission of a contract. Woolridge v. ExxonCorporation, 39 Conn. Sup. 190, 192 (1984).
In this case Bonavita represented to the Russos through his agent, Rosen, that the income producing billboard was located entirely on the subject property. At that point both parties were under the mistaken belief that the billboard was located entirely on the subject property. However, the case changed from one of mutual mistake to one of fraudulent misrepresentations when Bonavita agreed to take the position that the Patrick billboard was located partially on the 111 Homestead Avenue property. His entry into that agreement evidenced a total disregard for his agent's prior representations to the Russos concerning the location of the billboard.
In Kavarco v. T. J. E., Inc., 2 Conn. App. 294, 478 A.2d 257
(1984) the Court set forth the elements of fraudulent misrepresentation as follows:
 (1) That a false representation was made as to a statement of material fact; (2) that it was false and known to be false by the party making it; (3) that it was made to induce the other party to rely upon representations; and (4) that the party, in fact, acted upon the false representations to its detriment.
2 Conn. App. 294 at 295-296; see also J. Frederick Scholes Agencyv. Mitchell, 191 Conn. 353, 358, 464 A.2d 795 (1983); Miller v.Appleby, 183 Conn. 51, 56, 438 A.2d 811 (1981).
Where a defendant has a special means of knowledge and the circumstances permit the plaintiff to attribute to the defendant accurate knowledge of what is represented, the plaintiff need not show actual knowledge of the falsity of the representation. Miller,supra, at 56; Richard v. A. Waldman Sons, Inc., 155 Conn. 343,346-347, 232 A.2d 307 (1967); J. Frederick Scholes Agency v.Mitchell, 191 Conn. 353, 359, 464 A.2d 795 (1983).
The parties do not dispute the fact that Rosen was acting within the scope of his authority from Bonavita at all times relevant to this action. Notice to, or knowledge of, an agent, while acting within the scope of his authority and in reference to a matter over which his authority extends, is notice to, or knowledge of the principal. Trap Falls Realty Holding Ltd.Partnership v. Board of Tax Review, 29 Conn. App. 97, 103, CT Page 12550612 A.2d 814 (1992); Bank of Montreal v. Gallo, 3 Conn. App. 268, 273,487 A.2d 1101 (1985); Derby v. Connecticut Light and Power Co..167 Conn. 136, 142, 355 A.2d 244 (1974).
In this case the Russos were entitled to expect that Bonavita, and his agent, Rosen, had accurate information about the location of the billboard on the subject property. Therefore, the plaintiff need not prove that Bonavita had actual knowledge of the falsity of the representation.
The plaintiff also claims that he is entitled to recovery based on the theory of innocent misrepresentation. This court agrees. The elements for a cause of action in innocent misrepresentation are: 1) a representation of material fact; 2) made for the purpose of inducing the purchase; 3) the representation is untrue; and 4) there is justifiable reliance by the plaintiff on the representation of the defendant. Frimbergerv. Anzellotti, 25 Conn. App. 401, 410, 594 A.2d 1029 (1991). In this case Rosen's representation as to the billboard location was clearly material, was made for the purpose of inducing Russo to purchase the subject property, was untrue and Russo justifiably relied on the representation in purchasing the property.
Bonavita has argued that the plaintiff could have protected himself from the effects of the misrepresentation by obtaining a survey of the subject property. However, courts in this and other states have refused to allow a wrongdoer to escape liability for his misrepresentations by pointing to the adverse party's failure to independently discover the falsity of those misrepresentations. The Court in Kavarco stated:
 The recent weight of authority is that the right to rescind a contract for the sale of land, or a contract for the sale of a business, or a lease, is not necessarily destroyed because the buyer failed to make an independent investigation which would have revealed that the representation upon which he relied was false. See Pacelli Bros. Transportation Inc. v. Pacelli, supra, 409; Besett v. Basnett, 389 So.2d 995, 998 (Fla. 1980); National Conversion Corporation v. Cedar Building Corporation, 23 N.Y.2d 621, 627-28, 246 N.E.2d 351, 298 N.Y.S.2d 499 (1969); Slocum v. Leffler, supra, 704; Wilson v. Zimmerman, 261 Or. 528, 532-33, 495 P.2d 713
(1972). CT Page 12551
 To shield a seller with a buyer's negligence in not finding out whether the representation was true or false would be to give a seller the fruit of his falsehood. The defendants' argument raises the issue of whether the law should choose either to allow the person who fraudulently misrepresented a basic fact to use the armament of caveat emptor to escape liability, or not to require the person to whom the misrepresentation was made to conduct an independent investigation as to the truth of an ascertainable fact. The Restatement chooses the latter. 2 Restatement (Second), Torts 540. This court does also.
2 Conn. App. at 301-302.
The elements of a cause of action for tortious interference with business relations are: "[1] the existence of a contractual or beneficial relationship; [2] the defendant's knowledge of that relationship; [3] the intent to interfere with it; and [4] the consequent actual loss suffered by the plaintiff." Solomon v.Aberman, 196 Conn. 359, 383, 493 A.2d 193 (1985); Hart, Nininger Campbell Associates, Inc. v. Rogers, 16 Conn. App. 619, 629,548 A.2d 758 (1988).
In this case the plaintiff has established the existence of the foregoing elements with respect to Patrick, but has failed to do so with respect to Bonavita. There was insufficient evidence to support either a finding that Bonavita had knowledge of Russo's business relationship with Metro Bulletins or that Bonavita was aware that his agreement to allow Patrick to construct a billboard on his remaining property would interfere with Russo's relationship with Metro Bulletins.
Proof of the foregoing four elements alone, however, is not sufficient to establish a claim for tortious interference with a business expectancy. A claim is made out only when the interference is wrongful by some measure beyond the fact of the interference itself. Blake v. Levy, 191 Conn. 257, 260,464 A.2d 52 (1983). Appellate courts of this state have held repeatedly that in order to prevail in a claim of tortious interference with a business expectancy the plaintiff must prove that the defendant engaged in an act of fraud, misrepresentation, intimidation, molestation, or malice. Blake v. Levy, supra, at 261; Kecko PipingCo. v. Monroe, 172 Conn. 197, 201-202, 374 A.2d 179 (1977);Golembeski v. Metichewan Grange, 20 Conn. App. 699, 703, CT Page 12552569 A.2d 1157 (1990). Under the Restatement, the test is whether the actor's behavior is "improper." Blake v. Levy, supra,191 Conn. at 261 (citing 4 Restatement (Second), Torts § 767).
The conduct of Patrick was, arguably, improper and malicious. However, the broad terms "improper" and "malice" must be construed in conjunction with the principle that in order to establish tortious interference the plaintiff must prove that the defendant's conduct was in fact tortious. Blake v. Levy, supra, at 261;Golembeski v. Metichewan Grange No. 190, supra, at 702.
In cases where the Courts have found the defendant to have tortiously interfered with the plaintiff's business expectancy, the defendant's conduct has been found to be tortious in some manner other than the act of interference itself. In Solomon v. Aberman,196 Conn. 359, 493 A.2d 193 (1985) the defendants used their positions as members of a board of a health care facility to paint the plaintiff in a bad light and to harass and humiliate her. InHarry A. Finman Son, Inc. v. Connecticut Truck and TrailerService, Inc., 169 Conn. 407, 363 A.2d 86 (1975) the defendant used its position as the plaintiff's subdealer to make slanderous statements to the plaintiff's principal in an effort to interfere with the plaintiff's exclusive distributorship. Similarly, inSkene v. Carayanis, 103 Conn. 708, 131 A. 497 (1926) the defendants interfered with the plaintiff's real estate listing agreement by making misrepresentations to the property owner about the identity of the prospective purchaser.
In the foregoing cases the actions of the defendants were tortious. In this case there is no evidence that Patrick made any misrepresentations or committed any other tort in the course of, conduct which ultimately injured Russo.
Although the defendants' conduct did not rise to the level of tortious interference with business expectancy, it did constitute unfair and/or deceptive acts within the meaning of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110aet seq. ("CUTPA"). CUTPA proscribes a broader range of conduct than does the common law action for innocent misrepresentation, WebPress Serv. Corp. v. New London Motors, 203 Conn. 342, 361,525 A.2d 57 (1987), and unlike the tort claim for interference with business expectancies, which requires proof of malicious or deliberate interference with competitor's business expectations, CUTPA liability may be based solely on proof of unfair or deceptive acts. Sportsmen's Boating Corporation v. Hensley, 192 Conn. 747, CT Page 12553474 A.2d 780 (1984); Associated Investment Co. v. Williams Assoc.,230 Conn. 148, 158, ___ A.2d ___ (1994).
In determining whether a practice violates CUTPA, the court should employ these criteria: "`(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].' Conawayv. Prestia, [191 Conn. 484, 490-91, 464 A.2d 847 (1983)], quotingFTC v. Sperry Hutchinson Co., 405 U.S. 233, 244 n. 8,92 S.Ct. 898, 31 L.Ed.2d 170 (1972)." McLaughlin Ford, Inc. v. Ford MotorCo., 192 Conn. 558, 568, 473 A.2d 1185 (1984).
Under Connecticut General Statutes § 42-110a(4) "trade" and "commerce" means "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Bonavita sold commercial property to the plaintiff and Patrick's actions with respect to the plaintiff were taken in furtherance of its billboard advertising business. The defendants' actions in this case clearly took place in the course of a trade or business within the meaning of CUTPA.
Patrick knew that Russo had purchased the property on which Patrick's billboard was located, knew that Russo had the right to request Patrick to remove the billboard at the end of the existing lease term, and even attempted to enter into a new lease with Russo. Patrick also knew that Russo had entered into an agreement with Metro Bulletins, Patrick's competitor. Patrick took advantage; of its fortuitous discovery that its billboard was not entirely on the subject property to initiate a scheme which it knew would effectively block Russo from leasing a billboard to Patrick's competitor. Such conduct was unscrupulous, immoral and unethical within the meaning of CUTPA.
Bonavita's willingness to overlook his agent's representations to Russo about the sign location was an essential component of Patrick's scheme. In addition, the misrepresentation made on behalf of Bonavita to induce Russo to purchase the subject property was clearly a deceptive act within the meaning of CUTPA. CT Page 12554
Patrick contends that the plaintiff must prove that it engaged in a pattern of activities in order to establish a violation of CUTPA. Although this court has rendered a decision in PRF ofConnecticut, Inc. v. Gosselin, 1993 Casebase 10451 (Dec. 3, 1993) which contained dicta to the effect that CUTPA requires more than a single unfair or deceptive act, after reexamining the case law, this court now holds that a single unfair or deceptive act may violate CUTPA, except where the claimed violation of CUTPA is also a violation of the Connecticut Unfair Insurance Practices Act, "CUIPA", Connecticut General Statutes §§ 38a-815 et seq., which requires evidence of a pattern or practice of conduct. Mead v.Burns, 199 Conn. 651, 509 A.2d 11 (1986). "The overwhelming majority of Superior Courts have held that a single act is sufficient for liability under CUTPA," Rose Hill Associates v. St.Vincent Depaul Society of Waterbury, 5 Conn. L. Rptr. 477 (January 24, 1992, Langenbach, J.).
The damages recoverable against Bonavita on the mis-representation count are the same as those recoverable for a violation of CUTPA. Russo may recover from Bonavita the amount of $75,000, which is the difference between the price he paid at the time of the sale, $80,000, and the value of the property as it would have been if there had been no false representation, $5,000,Miller v. Appleby, 183 Conn. 51, 438 A.2d 811 (1981); Franchey v.Hannes, 152 Conn. 372, 381, 207 A.2d 268 (1965), together with prospective profits in the amount of $45,000, the amount the plaintiff would have received from Metro Bulletins under the new billboard lease. Morrell v. Wiley, 119 Conn. 578, 178 A. 121
(1935).
CUTPA also permits the recovery of punitive damages and legal fees and court costs. Tessman v. Tiger Lee Construction Co.,228 Conn. 42, 634 A.2d 870 (1993). The conduct of both defendants in this case evidenced a reckless indifference to Russo's rights sufficient to warrant an award of punitive damages. The court awards punitive damages against both defendants in the amount of $10,000. The court also awards reasonable attorney's fees in the amount of $20,000 based on its observations of the plaintiff's attorney at trial, the pleadings, legal memoranda, and the file.Plantedosi v. Floridia, 186 Conn. 275, 279, 440 A.2d 977 (1982);Lew-Ar Associates v. Pawlirzyn, 1993 Ct. Casebase 6871 (July 20, 1993, O'Neill, J[.]); Guty v. Antonio, 1993 Ct. Casebase 7076 (Aug. 9, 1993, Teller, J.) CT Page 12555
The rationale for the award of damages against Patrick is the same as that set forth above. Russo's ascertainable loss under CUTPA as a result of Patrick's unfair acts was $120,000, composed of $75,000 diminution in the value of the property and $45,000 in lost profits.
Based on the foregoing, judgment may enter in favor of the plaintiff against the defendants Albert Bonavita and Martin Media, Patrick's successor in interest, in the amount of $150,000.
By the Court,
Aurigemma, J.