[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum of Decision on Motion For Summary Judgment
CT Page 4810
In this action the plaintiff alleges that he purchased real property in reliance on an environmental site assessment prepared by the defendant, Dames Moore, Inc., for a third party and was damaged because the site assessment contained inaccurate information concerning the amount and location of lead paint on the property and the cost to remove the lead paint. The defendant has moved for summary judgment on the grounds that it owed no duty to the plaintiff in preparing its report and any reliance by the plaintiff was unwarranted.
Facts
The parties agree on the following material facts. On January 8, 1993 Dames Moore executed a contract (the "Midland Contract") with Midland Asset Management, Inc. ("Midland"), as asset management contractor to the Resolution Trust Corporation ("RTC"), in its capacity as receiver for failed financial institutions. The plaintiff was not a party to the Midland Contract and has no other contractual relationship with Dames 
Moore.
Under the Midland Contract Midland retained Dames Moore for the purpose of performing at Phase I Environmental Assessment and providing Midland with a written report concerning that assessment. The permitted uses of the report were specifically limited as follows: The Report and other instruments of service are prepared for, and made available for the sole use of Midland, and the contents thereof may not be used or relied upon by any other person without the express written consent and authorization of [Dames Moore].
Dames Moore never provided written consent, or even oral consent, that the plaintiff could use or rely on the report.
Pursuant to the Midland Contract, Dames Moore prepared for Midland a Phase I Environmental Site Assessment dated March 7, 1993 (the "Report") for the property at issue in this case, 251-253 Norwich Avenue, Taftville, Connecticut (the "Property"). The Report describes the Property as a 3-story, 5-unit wood frame apartment building, approximately 100 years old, vacant and in poor condition, on a .28-acre lot. CT Page 4811
The section of the Report entitle "Lead Paint" provided as follows:
 Suspect lead paint surfaces identified were tested using LeadCheck swabs (BGI Inc.). The LeadCheck swab provides an instant test for the detection of lead which is bases upon the reactivity of lead with certain compunds capable of forming strong complexes with lead. Lead reactive materials are incorporated within the swabs. These swabs serve as a presumptive test for lead detection. They do not provide exact measures of the amount of lead present.
 The LeadCheck swab test indicated that the paint surfaces on the exterior basement door and the exterior surface of Apartment (approximately 80 square feet) contain lead paint. Lead was not detected in the remainder of the tested surfaces.
Emphasis added.
The "Conclusions" section of the Report reitereated the limited nature of the lead testing performed at the Property. The "Estimated Expense" section of the Report stated:
 Approximately 100 square feet of painted surfaces containing lead were identified in the building. Encapsulation of these surfaces including wallboard coverings or painting with aggregate-filled paint or acrylic urethane, would cost approximately $100-$300 for the given quantity. Removal and replacement this material would cost approximately $400-$500.
 The above costs are estimates for the general region and may vary depending on material used. More accurate costs may be obtained by contacting certified lead paint abatement contractors in the area.
The plaintiff claims that he received a copy of the Report at an auction of properties to be sold by the RTC which was held May 10, 1993 and conducted by Kennedy-Wilson Inc., an auction house, in conjunction with Midland. He alleges that he received the Report as part of an "Information Package" provided by Kennedy-Wilson at the auction and that he relied on the portion of the Report concerning lead paint in bidding on the Property. CT Page 4812
At the auction the plaintiff signed a registration form containing the following acknowledgment: "I UNDERSTAND that each property is being sold as is, where is and without any warranties, express or implied, and that it is my sole responsibility to inspect the property prior to sale. The plaintiff also acknowledged that he received, read and accepted the Terms and Conditions of the auction, which contained the following disclaimers and notices:
 NEITHER SELLER NOR MIDLAND LOAN SERVICES, L.P. . . NOR ANY . . AGENT OR CONTRACTOR OF ANY OF THEM (COLLECTIVELY "OFFERORS") IS MAKING OR WILL MAKE ANY REPRESENTATIONS OR WARRANTIES . . . WITH RESPECT TO ANY PROPERTY OR ANY INFORMATION PACKAGE OR DISCLOSURE CONTAINED THEREIN OR RELATED THERETO OR TO ANY PROPERTY. IN NO EVENT SHALL OFFERORS BE LIABLE FOR OR BOUND BY ANY GUARANTEES, PROMISES, STATEMENTS, REPRESENTATIONS, WARRANTIES OR INFORMATION PERTAINING TO ANY PROPERTY MADE OR FURNISHED BY ANY AGENT, EMPLOYEE, CONTRACTOR OR OTHER PERSON OR ENTITY REPRESENTING OR PURPORTING TO REPRESENT ANY OF THEM . . NO ENVIRONMENTAL, STRUCTURAL OR ENGINEERING REPORTS, OR ANY OTHER TYPE OR KIND OF REPORT PREPARED BY A THIRD PARTY, IF ANY, INCLUDED IN ANY INFORMATION PACKAGE HAS BEEN OR WILL HAVE BEEN PREPARED BY ANY OFFERORS AND NO REPRESENTATIONS OR WARRANTIES ARE MADE WITH RESPECT TO THE TRUTH, ACCURACY OR COMPLETENESS OF SAME, AND NO PROSPECTIVE BIDDER OR PURCHASER SHALL BE ENTITLED TO RELY ON SUCH REPORTS OR ANY INFORMATION CONTAINED THEREIN.
In addition to the language set forth above, the Terms and Conditions of the auction contained language notifying the bidders that the properties were being sold in an "as is" condition and that the buyer must make his own inspection.
After successfully bidding on the Property, the plaintiff executed before a Notary Public a "Bidder's Affidavit" in which he swore under oath to the truth of the following:
Bidder understands that Bidder is responsible for CT Page 4813 independently inspecting and reviewing all aspects of the property or properties on which Bidder successfully bid at the Auction, including, but not limited to, the physical, legal and economic aspects of such property or properties. Further Bidder understands and agrees:
 (I) THAT SUCH PROPERTY OR PROPERTIES ARE SOLD "AS IS", "WHERE IS", WITH NO WARRANTY EXPRESS OR IMPLIED ABOUT CONDITION, USE OR POTENTIAL ECONOMIC BENEFIT . . . AND WITH BIDDER ACCEPTING ALL DEFECTS, BOTH APPARENT AND LATENT, AT BIDDER'S OWN, ABSOLUTE AND EXCLUSIVE RISK, (ii) THAT SUCH PROPERTY OR PROPERTIES ARE ACCEPTABLE IN ITS OR THEIR PRESENT CONDITION, AND THAT BIDDER HAS HAD AMPLE OPPORTUNITY TO VISIT THE PROPERTY OR PROPERTIES PRIOR TO THE AUCTION, . . . AND (v) THAT BIDDER HAS, PRIOR TO THE EXECUTION OF THE CONTRACT, READ THE CONTRACT AND ALL THE EXHIBITS AND ADDENDA THERETO, AND THAT BIDDER FULLY UNDERSTANDS THE LEGAL EFFECT OF THE CONTRACT AND IF BIDDER HAS ANY QUESTIONS REGARDING THE LEGAL EFFECT OF THE CONTRACT, SUCH QUESTIONS HAVE BEEN ANSWERED BY COUNSEL OF BIDDER'S CHOICE AND BIDDER HAS NOT RELIED UPON ANY REPRESENTATION OF ANY BROKER OR AUCTIONEER OR SELLER, ITS AGENTS, OR LEGAL COUNSEL, REGARDING THE CONTRACT.
The same day, plaintiff entered into a contract with the RTC to purchase the Property. That contract contained the same disclaimers found in the Bidder's Affidavit and the Terms and Conditions of Auction and contained and acknowledgment by the plaintiff that, among other things, 1) he had not relied on and is not entitled to rely on any representations by the seller or its agents as to the quality, nature, adequacy or physical condition of the Property, 2) he was aware that he had the responsibility to make legal, factual and other inquiries and investigations as he deemed necessary and 3) he released and discharged the seller, its employees, representatives, agents, etc., from any and all claims for damages concerning the condition of the Property.
The plaintiff bid and agreed to purchase the Property for CT Page 4814 $31,000. The closing occurred in July 1993. The plaintiff paid cash for the Property and did not retain the services of anyone to perform any inspection of the Property nor did he retain an attorney to represent him in connection with the purchase.
The plaintiff's Amended Complaint dated August 3, 1995 alleges that the Report contained "material misrepresentations" with respect to the existence and severity of lead paint at the Property and the cost to encapsulate or remove and replace painted surfaces containing lead and that he contracted to purchase the Property in justifiable reliance on these representations. The plaintiff further alleges that after July 8, 1993 he learned that virtually all surfaces at the Property contained "unacceptable toxic levels of lead paint requiring extensive and costly remediation," and that he suffered substantial monetary loss and damages as a result of defendant's negligent misrepresentation.
The First Count of the Amended Complaint seeks to recover based on negligent misrepresentations by Dames Moore and the Second Count alleges Dames Moore failed to exercise reasonable care in conducting lead paint testing at the Property and preparing the Report with regard to costs of lead abatement and in reporting the nature, extent and results of lead testing at the Property.
Dames Moore has denied the material allegations of the Amended Complaint and has interposed the following special defenses: failure to state a claim, failure to mitigate damages, contributory negligence, assumption of risk, and bar of the plaintiffs claims by Connecticut General Statutes § 52-584.
Discussion of the Law and Ruling
Practice Book § 384 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Connecticut Bank Trust Co. v. Carriage LaneAssociates, 219 Conn. 772, 780-81, 595 A.2d 334 (1991), Lees v.Middlesex Ins. Co., 219 Conn. 644, 650, 594 A.2d 952 (1991). Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact; D.H.R.Construction Co. v. Donnelly, 180 Conn. 430, 434, 429 A.2d 908
(1980); a party opposing summary judgment must substantiate its CT Page 4815 adverse claim by showing that there is a genuine issue of material fact, together with the evidence disclosing the existence of such an issue. Practice Book §§ 380, 381; Burns v.Hartford Hospital, 192 Conn. 451, 455, 472 A.2d 1257 (1984). In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party.Town Bank Trust Co. v. Benson, 176 Conn. 304, 309, 407 A.2d 971
(1978); Strada v. Connecticut Newspapers, Inc., 193 Conn. 313,317, 477 A.2d 1005 (1984). The test is whether a party would be entitled to a directed verdict on the same facts. Batick v.Seymour, 186 Conn. 632, 647, 443 A.2d 471 (1982); New MilfordSavings Bank v. Roina, 38 Conn. App. 240, 243-44, 659 A.2d 1226
(1995).
Summary judgment should only be granted if the pleadings, affidavits and other proof submitted demonstrate that there is no genuine issue as to any material fact. Scinto v. Stam,224 Conn. 524, 530, 620 A.2d 99, cert. denied, 114 S.Ct. 176,126 L.Ed.2d 136 (1993); Connel v. Colwell, 214 Conn. 242, 246, 571 A.2d 116
(1991).
In order to recover against Dames Moore under either the theory of negligence or negligent misrepresentation, the plaintiff must prove that Dames Moore owed him a duty of care under the circumstances of this case. "Negligence is a breach of duty. . . . The law does not recognize a `duty in the air.' To sustain a cause of action, the court must determine whether the defendant owed a duty to the [plaintiff] and the applicable standard of care. The existence of a duty is a question of law.
Only if such a duty is found to exist, does the trier of fact them determine whether the defendant violated that duty in the particular situation at hand." Shore v. Stonington,187 Conn. 147, 15-52, 444 A.2d 1379 (1982). (Citations and internal quotation marks omitted) (Emphasis added).
Liability for negligent misrepresentation is limited to the intended recipients of the information. The governing principles of a claim for negligent misrepresentation are set forth in Restatement (Second) of Torts § 552, Williams Ford, Inc. v.Hartford Courant Co., 232 Conn. 559, 575, 657 A.2d 212 (1995), which provides:
 One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to CT Page 4816 liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
The liability "is limited to loss suffered by the person . . . for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so knows or intends or in a substantially similar transaction." Restatement § 552(2).
The Connecticut Supreme Court has stated "that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would `anticipate that harm of the general nature of that suffered was likely to result,' and (2) a determination, on the basis of a public policy analysis of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." Zamstein v.Manasti, 240 Conn. 549, 558, ___ A.2d ___ (1997), citing RKConstructors, Inc. v. Fusco Corp., 231 Conn. 381, 386,650 A.2d 153 (1994).
The plaintiff has not established the existence of a legal duty of Dames Moore under either the foreseeability or the public policy prong of the RK Constructors test. The Comment to Restatement § 552 provides:
 [O]ne who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose. By limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests.
The Connecticut Supreme Court has placed a similar limitation on CT Page 4817 liability for negligent misrepresentation. "An actionable misrepresentation, whether made knowingly, recklessly, negligently, or innocently, must be made for the purpose of inducing action upon it." J. Frederick Scholes Agency v.Mitchell, 191 Conn. 353, 359, 464 A.2d 795 (1983).
Dames Moore clearly did not intend to supply information to the plaintiff and was not "manifestly aware" that the plaintiff would rely on the representations in the report to Midland. To the contrary, both the Dames Moore Report and the Midland Contract contain language whereby Dames Moore affirmatively disavowed its intention that anyone except Midland could or should rely on those representations. Given the terms of the Midland Contract and the Report, it was not foreseeable that the plaintiff would rely on Dames Moore's report.
Finding that the defendant had a duty to the plaintiff under the circumstances of this case is also contrary to public policy. The Property was owned by the Resolution Trust Corporation in its capacity as a receiver of failed financial institutions. The Property had been acquired by one of those failed institutions, Coastal Savings Bank, by foreclosure. There is nothing in the record before the court to indicate that Marine Midland's purpose in retaining Dames Moore was anything other than a good faith attempt to obtain some information about the RTC properties which it was going to auction. The inability of Dames Moore to limit its liability to the potentially large number of bidders at the Marine Midland auction may well have resulted in its unwillingness to make any representations at all about the Property or other RTC properties. Refusing to extend the liability of Dames Moore to the plaintiff and others who bid for such properties, will "promote the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests." See Comment, Restatement, supra.
In opposition to the defendant's Motion for Summary Judgment the plaintiff has filed an affidavit in which he makes the conclusory statement that his harm was "foreseeable to Dames 
Moore" because "they knew that the properties they were inspecting would be sold to buyers at an RTC auction." That statement is insufficient to overcome the Motion for Summary Judgment for three reasons. First, it is wholly unsupported by any evidence. "It is not enough . . . for the opposing party merely to assert the existence of . . . a disputed issue. Rather, the party opposing summary judgment must substantiate its adverse CT Page 4818 claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue . . ." Doty v. Mucci, 238 Conn. 800, 808, 679 A.2d 945
(1996).
Second, even if the statement were supported by evidence, it does not establish that Dames Moore made the representations in their report for the purpose of inducing reliance thereon by buyers at the auction. That element is necessary in order to establish a cause of action for negligent misrepresentation. SeeWilliams Ford v. Hartford Courant Co, supra.
Finally, and most importantly, the plaintiff's conclusory statement as to the knowledge of Dames Moore does not address the second or "public policy" prong of the RK Constructors test for determining the existence of a legal duty:
 A simple conclusion that the harm to the plaintiff was foreseeable, however, cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally "foreseeable," yet for pragmatic reasons, no recovery is allowed. See, e.g., Maloney v. Conroy, 208 Conn. 392, 400-401, 545 A.2d 1059 (1988) (looking beyond foreseeability, this court imposed limitations on the right of a bystander to recover for emotional distress that allegedly resulted from medical malpractice of doctors in their treatment of the plaintiff's deceased mother). A further inquiry must be made, for we recognize "that `duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." W. Prosser W. Keeton, supra, § 53, p. 358. "While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree." (Internal quotation marks omitted.) Maloney v. Conroy, supra, 401-402. The final step in the duty inquiry, then, is to make a determination of "the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." W. Prosser W. Keeton, supra, § 43, p. 281.
231 Conn. at 386. CT Page 4819
As previously stated, imposing liability on Dames Moore in the present case is contrary to the public policy in favor of encouraging the free flow of information in a commercial setting.
For the foregoing reasons the Motion for Summary Judgment is granted.
Aurigemma, J.