[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above encaptioned companion cases have been brought for the purpose of reducing or discharging mechanic's liens pursuant to § 49-35 (a) of the General Statutes. As noted by the parties, most of the underlying facts are not seriously disputed, but the consequences of the facts are most seriously, and impressively professionally,[1] contested.
The dispute arises in the context of several contractual relationships. The applicant Northland CityPlace II, LLC ("Northland") is the owner of an office building in downtown Hartford. On January 16, 2001, Northland leased two floors of the building to the applicant Merrill Lynch, Pierce, Fenner Smith, Inc. ("Merrill"). The lease contemplated a tenant build out of the leased premises. Pursuant to § 10-21 of the lease:
 To the extent and insofar as there is any work required to prepare the premises for . . . occupancy (herein referred to as "Tenant's Work"), the same shall be performed by Tenant at its sole cost and expense (subject to reimbursement of Landlord's Contribution, as hereinafter defined) in accordance with the terms and provisions of this Lease, including, without limitation, the requirement that Landlord approve Tenant's plans and specifications for Tenant's Work prior to the commencement thereof
And further:
 Provided that there shall be no outstanding violation of law or lien affecting the property by reason of Tenant's Work (unless such lien is bonded over by Tenant to Landlord's reasonable satisfaction), and provided that Tenant's Work shall CT Page 11532 not materially deviate from the plans and specifications therefore previously approved by Landlord, Landlord shall contribute up to $988,980.00 (i.e., $30.00 per square foot of rentable area of the Premises) (Landlord's Contribution") towards the leasehold improvements to be constructed by Tenant as part of Tenant's Work (including any necessary demolition work prior thereto) and the unaffiliated third-party design, architectural, engineering and filing fees related thereto.
Merrill Lynch subsequently entered into a Construction Management Agreement with Caswell Corporate Interiors, Inc. ("Caswell"), apparently on May 29, 2001. Although the agreement seems to contemplate a relationship of special trust, for our purposes it establishes Caswell as the general contractor for the Tenant's Work. Caswell hired the respondent PAC Group, LLC ("PAC") to perform much of the Work: the contract and approved change orders totaled more than $2,000,000. PAC ultimately was not paid $167,030.68 of the amount it was owed by Caswell, and it filed mechanic's liens as to Northland and Merrill. Because PAC claims that several payments by Merrill to Caswell were made too soon, and thus not entitled to good faith status sufficient to reduce the "lienable fund"; see § 49-36 (c) of the General Statutes; several of the provisions of the agreement between Merrill and Caswell are significant.
Article 7(B) of the contract provided that by the tenth of each month of the agreement Caswell was to submit to Merrill and to the architect, if required by Merrill, a notarized AIA form showing in detail the money actually paid and the costs incurred during the month for which reimbursement was requested, together with the amount of the contractor's fee for the month, together with payrolls and other data supporting the contractor's right to payment for subcontracts and materials. The contractor was to obtain the approval of the architect and the engineer, and Merrill was not obligated to pay more than the amount approved by the architect and the engineer. Article 7(G) allowed Merrill to withhold any payment to protect itself from loss, if, inter alia, proper documentation was not provided.
Article 7(I) defined "completion", for the purpose of the project, to mean "and be dependent upon final acceptance of the Work by Merrill's Project Manager [Caswell]." Upon acceptance, which required completed punch list work, issuance of all drawings and manuals, and removal of tools, the retainage would be paid. The retainage, or the amount withheld CT Page 11533 from each payment to secure proper completion, was defined in Article 6 (A)(2) to be 10% of each payment.[2] Article 7(J) provided that when Merrill received notice that the work was completed, it would inspect the work; if all was acceptable and the appropriate certificates obtained from local authorities, Merrill agreed to issue a signed final certificate indicating that the work had been completed. Prior to Merrill's issuing the final certificate, Caswell was to submit evidence "satisfactory to Merrill that all payrolls, material, bills and other indebtedness connected with the Work have been paid."
Article 7(K) provided that "final payment shall be due" 45 days after the work is fully completed and Merrill has received evidence "satisfactory to Merrill that all payrolls, material bills, and other indebtedness connected with the Work have been paid. . . ." Merrill may nonetheless make a partial payment but withhold such sums as it deems sufficient to protect its interests. Caswell was to deliver to Merrill "upon demand, simultaneously and as a strict condition precedent to final payment, a release in respect to the Work performed and materials furnished by . . . any Subcontractors retained by [Caswell]. . . ."
Merrill's position, it will be foreshadowed, is that many of the provisions in the contract between it and Caswell provide powers to Merrill but do not impose duties, such that Merrill had the ability to require various items of documentation and to condition payment on various factors, but it did not have the obligation to do so. Merrill relies as well on common law authority, most notably Hubbell, Hall andRandall Co. v. Pentecost, 89 Conn. 262 (1915), for the proposition that so long as payment is not made for work not yet done, the owner's payment to the general contractor is not premature for the purpose of determining the amount of the lienable fund available to the unpaid subcontractor. PAC, on the other hand, posits that § 49-36 (c) of the General Statutes clearly states that "[n]o payments made in advance of the time stipulated in the original contract may be considered as made in good faith. . .", and that several of the payments, particularly the last two, were accordingly made prematurely.
With this framework in mind, I turn to the history of payments. PAC's applications for payments from Caswell for the first few months were processed and paid without incident. The final application, dated November 15, 2001, is in the amount of $276,575.49. Caswell did not pay all of the amount, and PAC has been left with $167.030.68 in unpaid bills. There have been no questions raised about the quality of work done by PAC or the amount owed to it by Caswell. No evidence was submitted regarding what happened to Caswell: for whatever reason, it did not pay PAC the full amount owed. CT Page 11534
The history of Merrill's payments to Caswell are critical to the present dispute, however. Again, the first months' payments are not controversial[3] and, again, it is not disputed that Merrill did indeed pay Caswell the full amount of its contractual obligation to Caswell. But, because of the operation of § 49-36 (c), the question is whether payments were made prematurely.
At the risk of oversimplifying, I will summarize the payment history. Merrill made six payments to Caswell. The first four, responding to Caswell's applications submitted in June, July, August and September, 2001, are not controversial. The fifth, applied for and approved on October 30, 2001, and paid on November 6, 2001, was in the amount of $226,461.40 and consisted primarily of released retainage. The sixth was applied for on November 16, 2001, approved on November 19, 2001, and paid December 3, 2001, and was in the amount of $117,367.00. It is not entirely and precisely clear what work this amount paid for: certainly a substantial amount was for change orders. It is clear that as to the last two payments, Caswell did not supply documentation mentioned in Article 7. More specifically, it is quite clear that the retainage was released without waiting for the events specified in Article 7(I) and the final payment was made less than 45 days after the most likely definition of "full completion". From the testimony of Paul Brandenberg, Merrill's representative, it is quite clear that, as a general proposition, Merrill simply relied on the representations of Caswell and paid each application as it was presented.
Although it is more difficult to track the progress of the work and to buttonhole into a specific category each item of work, several propositions are apparent. First, "substantial completion" occurred on August 17, 2001. Substantial completion, a term not referenced in the contractual arrangements between the parties, occurs when the work is sufficiently completed so that a tenant may move in under a temporary certificate of occupancy. In addition to original contract work, PAC completed several change orders, and also, as is routine, completed punch list work and warranty work. The line between punch list work and warranty work tends to blur, and Paul Prenoveau, the principal of PAC, was unable to state precisely when each category of work was performed or completed. As a general proposition, it is probably fair to say that the great bulk of original contract work and punch list work was completed by the end of September and that "nothing significant" was left to do after November 15, 2001.
In any event, PAC filed liens as to Merrill and Northland in January, 2002, and the latter two entities have filed, pursuant to § 49-35a of CT Page 11535 the General Statutes, applications to reduce or to discharge the liens. Pursuant to § 49-35b of the General Statutes, at the hearing on such application the lienor, in this instance PAC, has the burden "to establish that there is probable cause to sustain the validity of his lien." If that is accomplished, then the applicant has the burden to prove by clear and convincing evidence that the lien should be discharged or reduced. Probable cause has been defined as follows:
 Proof of probable cause is not as demanding as proof by a fair preponderance of the evidence. Ledgebrook Condominium Assn., Inc. v. Lusk Corporation, 172 Conn. 577, 584, 376 A.2d 60 (1977). "The legal idea of probable cause is a bona fide belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it., Wall v. Toomey, 52 Conn. 35, 36 [1884]. . . ." Ledgebrook Condominium Assn., Inc. v. Lusk Corporation, supra.
 Newtown Assoc. v. Northeast Structures, INC., 15 Conn. App. 633, 636-37 (1988).
Clear and convincing evidence has been defined as follows in Miller v.Commissioner of Correction, 242 Conn. 745, 794-95 (1997):
 The clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt. It "is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably(fn31) true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Emphasis added; internal quotation marks omitted.) State v. Bonello, 210 Conn. 51, 66, 554 A.2d 277, cert. denied, 490 U.S. 1082, 109 5. Ct 2103, 104 L.Ed.2d 664 (1989).
 Although we have characterized this standard of proof as a "middle tier standard"; J. Frederick Scholes Agency v. Mitchell, 191 Conn. 353, 358, 464 A.2d 795
(1983); and as "an intermediate standard"; State v. Davis, supra, 229 Conn. 293; between the ordinary CT Page 11536 civil standard of a preponderance of the evidence, or moreprobably than not, and the criminal standard of proof beyond a reasonable doubt, this characterization does not mean that the clear and convincing standard is necessarily to be understood as lying equidistant between the two. Its emphasis on the high probability and the substantial greatness of the probability of the truth of the facts asserted indicates that it is a very demanding standard and should be understood as such, particularly when applied to a habeas claim of actual innocence, where the stakes are so important for both the petitioner and the state. We have stated that the clear and convincing evidence standard "should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) Lopinto v. Haines, 185 Conn. 527, 539, 441 A.2d 151 (1981).
Two issues are presented for resolution according to the above framework: whether all of Merrill's payments to Caswell were made in good faith as defined in § 49-36 (c) of the General Statutes and whether Northland "consented" to the work such that it may be deemed to be liable to pay for work done. We turn first to the question of whether payments were "bona fide." Again, it is agreed that Merrill has paid the full contract price to Caswell and that none of the other adjustments to the "lienable fund" available to a subcontractor pursuant to § 49-33 (f) apply.[4]
Section 49-36 (c) of the General Statutes provides:
 In determining the amount to which any lien or liens may attach upon any land or building . . ., the owner . . . shall be allowed whatever payments he has made, in good faith, to the original contractor or contractors, before receiving notice of the lien or liens. No payments made in advance of the time stipulated in the original contract may be considered as made in good faith, unless notice of intention to make the payment has been given in writing to each person known to have furnished materials or rendered services at least five days before the payment is made. (Emphasis added).
The applicants rely on Hubbell, Hall Randall Co. v. Pentecost, CT Page 1153789 Conn. 262 (1915), for the proposition that so long as payments are not made earlier than the work for which the payments are made is completed, the payments are made in good faith for the purpose of reducing the amount available to the subcontractor. In Pentecost, the owner made several payments to the general contractor, who then abandoned the work. The owner hired someone else to finish the work. The total amount of payments exceeded the original contract price, so that the only issue was whether several payments made to the general contractor were premature and thus not made in good faith under the statutory language.[5]
Although the Pentecost decision does not state in any detail the contract language regarding payment, it does state that periodic payments were to be made as the work progressed and were dependent on the architect's certification. The payments apparently were made in a timely manner, but did not await certification by the architect. The Supreme Court held on those facts that the payments were not (with one later exception involving the owner's being on notice that a subcontractor had performed work not paid for) premature:
 The manifest object of this provision of the statute is that unpaid subcontractors may have actual notice from the face of the contract of the times when payments may be expected to be made to the general contractor. When, as in this case, the instalments are made payable as the building progresses, the subcontractors are sufficiently advised by the progress of the work as to the time when the next instalment will become payable, and may act accordingly. But the additional provision for an architect's certificate adds nothing to their information in such a case, and they are not bound by it; for if the architect gives his certificate before the time stipulated for in the contract, the subcontractors are not bound by the payment.
 Hubbell, Hall Randall Co. v. Pentecost, 89 Conn. 262, 266 (1915).
Although the facts informing Pentecost are scantily reported, it appears that a subcontractor could examine the original contract and determine that payments were due at certain stages of the completion of the work. It could then, by observing the work in progress and comparing the work to the language of the contract, determine when the next payment was due. In this context, the subcontractor would not be helped one way or the other by the certification of the architect as to when payment was due, and the subcontractor would not be likely to know in any event CT Page 11538 whether the architect had certified the application for payment. The lesson of Pentecost for our purposes is that failure to observe a true technicality, from the perspective of the interests which the statute is designed to protect, will not destroy the good faith nature of a payment to a general contractor. On the other hand, the case also indicates that subcontractors need the protection of being able to determine when payments are due in order to protect their rights; Pentecost does not appear to me to support the blanket proposition that payments are necessarily timely whenever they postdate the work paid for. Rather, they are timely when made pursuant to the terms of the contract.
The case of Renee Drywall Co., Inc. v. Strawberry Hill Ass'n.,182 Conn. 568 (1980), is similarly fact bound. There, the issue was whether payments made by an owner to the general contractor were made in good faith, especially where some were made payable in addition to several subcontractors, not including the plaintiff. The case includes language to the effect that the statutory scheme does not guarantee that a subcontractor will be protected in all instances against the defalcations of the general contractor — with whom, significantly, the subcontractor is in privity and whose defaults ought to be expected to be borne, at first glance, by the subcontractor. On the facts of that case, which are not especially analogous to those at hand, the trial court's determination that the owner had acted in good faith and reasonably was not disturbed on appeal. It would appear that the determinations of good faith, and prematurity of payments, are peculiarly fact driven.[6]
The determination of the question of prematurity in this case depends upon the application of the burdens. The lienor's burden is light: in order to sustain his burden, he has to present evidence under which a prudent person would reasonably "entertain" the validity of the lien. This PAC has done: it clearly established that it performed the work and was not paid. It raised sufficient credible facts as to whether the language of the "original contract"[7] had been followed as to timeliness to cause a prudent person at least to entertain the notion that payments were made before called for in the contract. The applicants argue that the provisions requiring certain documents were largely discretionary and Merrill could choose whether or not to require documents and could choose whether or not to make certain payments. This may be true, but it overlooks the rather objective language regarding requirements for the release of retainage and "final payment". A reasonable subcontractor, reading the language of the contract, may well conclude that there is no need to file mechanic's liens or otherwise notify the owner of a problem until the time is about to come for those payments to be made. Similarly, there is sufficient doubt regarding the correlation between CT Page 11539 the contract language and the history of payments and progress of the work to prevent a finding that the applicants have proved by clear and convincing evidence that the payments were not premature. I find, then, that the lien ought not be discharged or reduced as to Merrill, because its burden as to establishing timely payments has not been met.[8]
The second issue is whether the lien ought to be discharged as to Northland. There is no evidence of any direct agreement between Northland and any of the contractors responsible for performing the work. As stressed by PAC, there is no doubt but that Northland was most interested in the work, regularly attended meetings regarding the work, was protective of common areas and areas controlled by the landlord and kept careful track of and charged for time spent by its employees in accommodating the ongoing work. Northland also agreed to pay Merrill almost a million dollars toward the project once it was completed and Northland was satisfied that no loose ends, including liens, were outstanding. There is no doubt that Northland consented to the work, in the sense of allowing it to proceed so long as its requirements were met, and that it kept in close touch with the progress of the work. Perhaps ironically, Northland appears to have kept itself better informed of the progress of the work than Merrill did.
This does not mean, however, that PAC's lien as to Northland may be sustained on the basis that there was "consent" that the work be performed:
 "[A] landowner does not subject his property to a mechanic's lien by simply allowing work to be done on it." [Hall v. Peacock Fixture Electric Co., 193 Conn. 290, 295, 475 A.2d 1100 (1984)]. Nor does the owner's knowledge that the work is being done subject the property to a mechanic's lien. Newtown Associates v. Northeast Structures, Inc., 15 Conn. App. 633, 639-40, 546 A.2d 310 (1988). "The consent meant by the statute must be a consent that indicates an agreement that the owner of at least the land shall be, or may be, liable for the materials or labor." Avery v. Smith, 96 Conn. 223, 228, 113 A. 313
(1921). Although an express contract is not necessary for such a consent, the services must be furnished under circumstances indicating an implied contract by the owner to pay for them. Id.
 Centerbrook, Architects v. Laurel Nursing Serv., 224 Conn. 580, 591 (1993).
CT Page 11540
Here, there is no evidence that Northland "consented" to the work with an eye to pay for the work; there is no evidence which would support an implied contract with Caswell or any subrogees. The substantial payment promised to Merrill on completion was clearly part of the financial arrangements between Northland and Merrill, but it had nothing to do with Merrill's contractual arrangements with its contractor. I find that Northland has sustained its burden by clear and convincing evidence as to the lien imposed on its ownership interest, and the lien is discharged as to Northland.
In conclusion, the lien as to Northland is discharged and is neither discharged nor reduced as to Merrill.
Beach, J.